[No. 22305. Department Two. August 8, 1930.]

M. H. CLINE *et al., Respondents,* v. MAX ALTOSE *et al., Appellants.*[1]

*Sather & Livesey,* for appellants.

*F. M. Hamilton* and *C. E. Abrams,* for respondents.

FULLERTON, J.—In this action, the respondents Cline recovered in damages against the appellants Altose, as for a wrongful eviction from certain real property which the respondents held under lease from the appellants. The action was tried to a jury, in which a verdict was returned in the sum of $3,500. From a judgment entered on the verdict, the appeal is prosecuted.

The principal contention of the appellants is that the evidence does not sustain the verdict of the jury. It may aid to an understanding of the question involved if something of the history of the transactions

[1]Reported in 290 Pac. 809.

out of which the controversy arises is recited. The appellants own, and for some years have owned, parts of certain described lots situated in the business section of the city of Bellingham. The property was surrounded by other business properties, the occupants of which were engaged in businesses usual in such a situation. In the early part of the year 1926, an enterprise had been started in another part of the city which it was thought might attract the general public away from this particular locality, and which would result in a loss of the patronage the businesses conducted therein had theretofore enjoyed.

To counteract this possible loss, the owners of the surrounding property conceived the idea of having a building constructed in the vicinity in which a public market could be conducted. A committee appointed for that purpose approached the appellants and sought to have them erect a building suitable for that purpose on the lots owned by them. They submitted plans for such a building, which it was estimated could be constructed at a cost of $30,000. The appellants took the proposition under advisement, and later on concluded to erect the building.

It was found, however, that the building, as planned, could not be erected wholly on the lands owned by the appellants, and that an additional fractional lot would have to be purchased, and which the appellants did purchase at a cost to themselves of $11,500. Subsequently they erected the building, at a cost possibly in excess of the estimated cost, but in their subsequent dealings with the committee and the respondents, they absorbed such difference as there was, and treated with the committee on the basis of the original cost. To finance the building, the appellants borrowed on the property the sum of $35,000 from a building and loan association, agreeing to repay the loan in monthly

installments of $500 each, payable on or before the third day of the month.

The committee selected the respondents as the general tenants of the property, and on June 2, 1926, while the building was in the course of construction, the appellants entered into an agreement of lease with them by which they leased the property to them for a period of ten years, the term to commence on the completion of the building. The rent reserved in the lease was $790 per month for the first year of the term, and $770 per month for the remainder. It was agreed that the rental for the last year of the term should be paid at the time the respondents took possession of the building, and that the rental for the preceding years should be paid monthly in advance on the first day of each and every month. It was expressly provided in the lease that the rent should be paid punctually at the time it became due; that the time of the payment was the essence of the agreement, and that, for any default therein, the appellants could lawfully re-enter the premises and remove all persons therefrom.

The respondents, although they had conducted a grocery in the city of Bellingham for some ten years prior to the execution of the lease, were practically without means, and, to finance their part of the undertaking, the property holders and business men above mentioned raised among themselves some $8,000, or more, and advanced the money to them for that purpose.

The building was completed by the appellants in the early part of November, 1926, and the respondents took possession thereof under the lease shortly thereafter. The respondents had difficulty in meeting the rental obligation from the start. Rarely, according to the testimony of the appellants, which seems not to be denied by the respondents, did they pay it punc-

tually as agreed. At times it was paid in partial payments, the final payments extending well into the month on which it became due. In October, 1927, the citizens' committee, at the request of the respondents, induced the appellants to accept a monthly payment of $600 for the ensuing year, the respondents agreeing to pay the difference, $170 per month, during the last year of the term. This agreement expired by its terms on October 31, 1928, and there was due on the first day of the month following the sum of $770. The lease did not provide for the payment of the rent at any particular place, nor did the respondents tender the rent on its due date, or at any time thereafter. On November 5, some four days after the rental was due and payable, one of the appellants went to the respondents' place of business to collect the rent, and it was then that the acts occurred which are thought to constitute an eviction. These specific acts are stated in the respondents' brief in the following language:

"(1) Appellants through Hyman Altose, on November 5, 1928, went to Frank Hiraki and demanded that he pay his rent to appellants, and if not paid they would throw him out.

"(2) Appellants, through Hyman Altose, on November 5, 1928, went to Marjorie Hills and directed her not to pay her rent to respondents until she heard again from him. (Hyman Altose.)

"(3) Appellants, through Hyman Altose, on November 5, 1928, went to Marx and demanded rent, and caused Marx to get into the position that he did not know whom to pay."

On the following day, to quote the language of the respondent M. H. Cline, the following occurred:

"I called Mr. Altose on the telephone and asked him to come over, and he did, and then I told him, the fact of his seance here yesterday and him going to Frank, downstairs, the Jap, and I had been informed by other

tenants this morning that he had requested them not to pay me any rent, and under these conditions, I considered he broke that lease.''

At this time, the respondents tendered the keys of the building to the appellant named, and announced that they would immediately remove from the building, and began the work of removing on the same day, completing it on the following morning. The persons named, from whom it is claimed the appellants demanded the payments of rent, were subtenants of the respondents, and it was testified by the respondents that the demands of the appellants so confused the tenants that they did not know to whom to pay the rents, and that they were thus unable to make sufficient collections to meet the rents due the appellants.

The evidence thought to sustain the claims made by the respondents is, to us at least, not very satisfactory. The respondents and their son testified that the demand made upon Hiraki for the payment of rent, accompanied by a threat to throw him out, was made in their presence. But both the appellant charged with making the threat and Hiraki deny that any such demand or threat was made. The appellant admits, and Hiraki testified, that the appellant inquired of Hiraki whether or not he had paid his rent, and testified that Hiraki told the appellant that he was not then owing any rent to the respondents; that Hiraki had paid for the current month, and that his next payment was not due until some five days after the conversation occurred. In corroboration of this statement that no rent was then due from Hiraki to the respondents, the written lease under which Hiraki held his tenancy was produced. This, in express terms, provides for rent payable in advance on the 10th day of each and every month, and even the respondents do not testify that he was then delinquent.

The testimony offered in support of the demands for rent made upon Hills and Marx were admissions claimed to have been made by the appellant Hyman Altose. Both of these tenants deny that any such demand was made upon them. Hills also testifies that she was not then owing any rental to the respondents; that she was holding under a verbal lease, with rentals payable on the 10th day of each month, and that her rental for the current month had been paid. She also testifies that Hyman Altose inquired of her whether she was then owing any rents to the respondents, and, not fully understanding him, asked him whether she should pay the next accruing rent to him, and that he answered, ''No, no, no, pay it to Cline.'' Her testimony was sought to be impeached by showing she had made statements contradictory of her testimony, but these came for the greater part from a witness, who, as we read the record, was himself very successfully impeached. The testimony of Marx is that no demand was made upon him by the appellants to pay rent until after the respondents had left the premises.

The testimony to the effect that the respondents were forced to abandon the lease because of the interference by the appellants with their tenants manifestly has no support in the evidence. The rent the respondents were required to pay became due on the first day of the month. The tenants with whom the transactions occurred, which is thought to amount to an unlawful interference, occurred five days thereafter, at a time when the tenants owed no rentals, and would not owe any for the succeeding five days. The tenants interfered with did not quit the premises because of the interference. On the contrary, they were in possession at the time the respondents abandoned them, and continued to stay therein for several months after the respondents had abandoned the premises,

and it is at once apparent, of course, that rentals due ten days after the first of the month could not be relied upon to pay an obligation due on the first of the month. Moreover, the respondents did not stay in the possession of the premises until the rents from the tenants became due. They moved out prior to that time, and it seems hardly reasonable to say that these transactions were the cause of the removal, or that they furnished any basis from which the jury could so find.

From the recitals we have made, it is clear that there were other causes than those specifically relied upon which could induce the respondents to abandon their lease. In addition to these, the evidence disclosed that the year during which the appellants were holding under a reduced rent expired on October 31, 1928, that the rent commencing with November 1, 1928, was $770, and that the respondents had theretofore sought the aid of the committee mentioned to secure a reduction for the ensuing year. They sought a reduction to a less sum than they had paid in 1927, and negotiations looking to that end had been taken up with the appellants, but no agreement had been reached, as the appellants had refused to consider the amount offered them, because, as they contended, the sum proffered would not meet their obligation due on the mortgage on the property and the fixed charges thereon, such as taxes, upkeep and the like. The appellants, however, had not refused to make any reduction in the rent, and negotiations for an amicable settlement were in progress at the time the respondents removed from the building.

Nor were the appellants guilty of conduct showing a desire to embarrass the respondents. The subtenants named were not the only subtenants occupying the building. The appellant Hyman Altose testified, and we find no contradiction of the testimony, that there

were about fifteen in all, some of whom had paid rent in advance to the respondents. The same appellant testified, and again we find no contradiction, that he offered to accept even part of the rent due, and that this was refused him. Furthermore, the respondents, when they removed from the property, carried with them the advance rents they had received, and left a number of current bills unpaid which the appellants were required to pay to protect their interests in the property.

The verdict of the jury was general. They simply found in favor of the respondents, and assessed their damages in a named sum. Their finding in favor of the respondents, however, necessarily implies that there was a constructive eviction, and the question remains whether the evidence, construed in its most favorable light, justifies the conclusion that the acts of the appellant amounted to such an eviction. This was a question of law, which the trial court was required to determine, and is a question reviewable in this court. *Thompson v. R. B. Realty Co.,* 105 Wash. 376, 177 Pac. 769.

The cases determined by this court in which the question of constructive eviction was involved are not many, and none of them is very closely allied to the instant case in its facts. The first of these is *Ralph v. Lomer,* 3 Wash. 401, 28 Pac. 760. In that case, there was no actual eviction, even up to the time of the trial of the action. The tenant, however, claimed a constructive eviction because the landlord had begun what he conceived to be an unwarranted action against him to recover possession of the premises for non-payment of rent. We held that there was not a constructive eviction, using this language:

"As a general rule, the acts of the landlord, in order to amount to a constructive eviction of his tenant,

must be such a physical interference with the possession of the tenant, under color of right, as to deprive him of the beneficial enjoyment of the demised premises, in consequence of which he abandons the same. We find no clearer statement of the law upon this question than that made by Endicott, J., in *DeWitt v. Pierson*, 112 Mass. 10, which is as follows:

" 'It is well settled in this commonwealth, that to constitute an eviction there must be either a physical ouster of the tenant by the landlord, or some act done by him on the premises, with the intent of depriving the tenant of the enjoyment and occupation of the whole or part of the same, to which the tenant yields the possession, within a reasonable time, and in either case the rent is suspended.' "

The next case is *Wusthoff v. Schwartz,* 32 Wash. 337, 73 Pac. 407. In that case, the landlord, during the tenant's term, and while the tenant was in possession, remodeled the building on the premises, and in so doing destroyed its usefulness to the tenant for the purposes for which it was leased. We held that the act of remodeling amounted to a constructive eviction of the tenant. In the course of the opinion, this language was used:

"It would seem that, if an eviction can be effected without the use of actual expulsive force, the above facts were sufficient to constitute such an eviction. It is a well established rule that actual force is not necessary to effect an eviction in law, but that any interference by the landlord with the full and substantial enjoyment by the tenant of the thing leased amounts to an eviction. . . ."

The case is strongly relied upon by the respondents to sustain their contentions in the present case, but it must be noticed that we did not say, as the respondents seem to infer, that any interference by the landlord with the rights of the tenant would work a constructive eviction, but said rather that such interfer-

ence must be of such a nature as to interfere with the full and substantial enjoyment of the premises by the tenant.

The question was next before us in *Tennes v. American Building Co.,* 72 Wash. 644, 131 Pac. 201. The facts of the case need not be recited. The case is pertinent only because of the rule announced defining acts necessary to constitute a constructive eviction. We there said:

"The rule is that 'any intentional or injurious interference by the landlord or those acting under his authority, which deprives the tenant of the means or the power of beneficial enjoyment of the demised premises or any part thereof or materially impairs such beneficial enjoyment, is a constructive eviction.' "

In *Thompson v. R. B. Realty Co., ubi supra,* we held that, to constitute a constructive eviction, there must be an intent on the part of the landlord to evict.

In *Brewster Cigar Co. v. Atwood,* 107 Wash. 639, 182 Pac. 564, we held that, where the successor to the original landlord, contrary to the terms of the lease under which the property was holden, changed the entrance-way to the building on the leased property, and sought to change the tenancy from a fixed period to a tenancy from month to month, it constituted an eviction and justified the tenant in abandoning the lease and removing from the property. In the course of the opinion, we quoted with approval the paragraph hereinbefore quoted from the case of *Wusthoff v. Schwartz.*

The foregoing cases plainly do not announce the rule that any interference by the landlord with the possession of the tenant, however slight, will work a constructive eviction, but, on the contrary, hold that the interference must be of a substantial nature, and so far injurious to his rights as to deprive him of the

beneficial use and enjoyment of the premises. While repeated trespasses on the leased property by the landlord, and insults and annoyances offered the tenant by him, if long continued, will operate as a constructive eviction, single instances of these sorts will not do so, even if they be of such a nature as to support an action in damages against the landlord.

In this instance, the landlord did not commit a trespass on the property by going upon the property at the time stated. As we have noted, the lease did not fix a place at which the rent was payable, and since the tenant did not bring the rental due to the landlord on its due date, the landlord was justified in going to the tenant on the premises and demanding it. And treating the act as an insult or as an annoyance, it was but a single act, not one of a series of acts. Moreover, as we have shown, the act did not affect the tenants' beneficial use of the premises. The subtenants did not remove from the premises because of the act, and whether because of the act they would have refused to pay rental to their immediate landlord cannot now be known, as they owed no rental at the time, and the principal tenant quit and abandoned the premises before the next rental payment became due. The acts of the landlord, in our opinion, do not amount to a constructive eviction.

The trial court should have sustained some one of the challenges the appellants interposed to the sufficiency of the evidence. Our order will be therefore that the judgment be reversed, and the cause remanded with instructions to dismiss the action.

MITCHELL, C. J., MAIN, MILLARD, and HOLCOMB, JJ., concur.