## MILESKI v. KERBY

(No. 2180; June 11, 1941; 113 Pac. (2d) 950)

(Rehearing denied without opinion, October 6, 1941)

110

For the appellant, there were briefs by *C. H. Harkins*, *C. R. Harkins* and *D. J. Harkins* of Worland, and oral arguments by *C. H.* and *D. J. Harkins*.

For the respondent, there was a brief by *C. A. Zaring* and *James A. Zaring* of Basin, and oral argument by *C. A. Zaring*.

*C. H. Harkins, A. R. Harkins* and *D. J. Harkins* in reply.

RINER, Chief Justice.

This is a direct appeal from a judgment of the district court of Washakie County, and presents the question whether the defendant and appellant, Kerby, was evicted by his lessor from certain premises leased by the plaintiff and respondent, Mileski, to the former, and who in consequence attempted to surrender the said lease, the surrender being claimed to have been accepted by Mileski. The question arose upon Mileski's action for the overdue rental alleged to be due plaintiff from the defendant for certain months under the lease aforesaid. The parties will usually be referred to as "lessor" and "lessee" or by their respective names. The essential facts out of which this controversy commenced are briefly these as disclosed by our examination of the record:

For some years prior to the 28th day of July, 1938, the appellant held a lease upon and was in possession of "the property known as the Elk Theater, located on the first floor of the two story brick building, situated on Lots 19 and 20, Block 3, Original Town of Worland, Wyoming". On the date last mentioned the lessor demised and leased to the lessee the property just described, for the term commencing August 1, 1938, and running until August 1, 1943, said demise being for the sum of $10,800.00 as rental for said premises, "payable at the rate of $180.00 per month in advance, on the 1st day of each month". The premises thus described were used by the lessee as a moving picture theater until about September 21, 1938, when he moved out whatever equipment was needed to operate what is designated in the record as lessee's "new theater" and abandoned the use of the premises described above as a picture show at that time.

It seems there was a basement underneath the sloping floor on which the picture show was conducted. In this basement and on the floor thereof there were two so-called dressing rooms located under the stage, which in years past, when road shows were in vogue, were used by the actors in preparing for their stage appearances. During the time Kerby ran the place as a moving picture show these rooms were used only to store a ventilating system, and lessee's operator of the moving picture machine, one Frank Killie, roomed there all the time. In the main part of the basement under the theater auditorium Kerby kept the "motor generator", which was used in operating the moving picture machine. He also had stored in the basement a lot of theater seats and other odds and ends. The lessor also seems to have kept lighting and heating equipment in said basement, a pool table and other material. As Mileski, the lessor, testified, "I told him (Kerby) to use it * * * when he needed it. When he wanted it he could use it just like I did". Both parties to the lease over a period of years appear to have thus made use of the basement. Neither seems to have made any objection to the use of the basement by the other until the matter of the card game came up, as subsequently hereinafter described.

When Kerby moved to his "new theater", as already mentioned, his moving picture machine operator still continued to make use of the dressing rooms as a place to sleep until about the 1st of October, 1938, at which time he also moved over to lessee's "new theater". Thereafter the leased property aforesaid would appear not to have been used by Kerby for any active purpose, except the basement, which was employed by him to store certain equipment not needed in his new theater. Kerby testified that his taking a lease for five years, at the time the written instrument aforesaid was

signed, was partly "to prevent competition in the way of another picture show coming in there".

Thereafter and about the middle of November, 1938, the lessor's son, one Peter Mileski, Jr., gave one Latham oral permission to start a card game in the dressing rooms aforesaid. Latham and Mileski, Jr., entered the basement and made some alterations by moving the partition between the two rooms to one side and putting in a heating and lighting system for the one room thus constructed. The material and equipment belonging to Kerby, which they found in the dressing rooms, they moved into another part of the basement under the theater, but, so far as can be told from the record, did no damage to it. Subsequently Kerby came and hauled the stuff which had been stored there away from the premises and sold part of it. Latham then used the room in the basement fashioned as described above, as a card room, for about six weeks. He agreed to pay Peter Mileski, Jr., $1.00 a day for every day "he had a game in there". The latter testified that Latham paid him $10.00 or $12.00 for the use of the room for playing cards; that his father owned and rented the building, and that he (the son) had no authority at all to rent the property, and that his father knew nothing about the arrangement between him and Latham at the time it was made.

The lessee, Kerby, testified that he learned through a friend that the basement premises above described were being used for card game purposes. Kerby then went into the basement and found several card tables in the room—formerly dressing rooms—and men playing cards there. He inquired of them who put them in there, and they said "Mileski". Kerby stated on the trial of the case that "they asked me if I wanted them to get out, and I told them I would go and see Pete (the lessor in the written five year lease), and I went to Pete about it". But Kerby took no other steps him-

self either by request or otherwise so far as the card players were concerned, to get them out. Kerby did, however, go to the lessor, Mileski, Sr., and complain of what had been done. The latter, testifying as a witness in his own behalf, said that he thereafter went into the basement aforesaid and stopped the use of the premises for card playing. The record is not altogether clear just when this occurred, but Latham left the premises some time the latter part of December, 1938. About the middle of December of that year Kerby turned over the key to this property to his lessor. There is some conflict in the testimony as given on the trial as to just what was said at that time, but there is none at all as to the return of the key. Mileski, Sr., testified that nothing was said. Kerby's testimony was that he told the lessor then that "you have taken over part of the building", and that "you can have the rest of it".

Kerby claimed that the above described acts on the part of Latham and Mileski, Jr., established a constructive eviction of the lessee from the leased premises. Kerby paid the rental prescribed in the written lease until January 1, 1939, and declined to pay any more. The lessor brought an action in the district court for the amount due upon eleven months delinquent rental after January 1, 1939. Kerby interposed the defense as already intimated, that he had been evicted from the premises by the lessor and had accordingly surrendered them, which surrender was accepted by Mileski, Sr. All this was denied by plaintiff's pleading in reply.

The district court of Washakie County found among other things that "the temporary use or occupancy of part of the basement, known as the dressing room" by Latham, "did not materially interfere with the defendant's use of said property and was insufficient to constitute an eviction of defendant therefrom". A general

finding was also made by the court in favor of the plaintiff and against the defendant, and a judgment was entered in plaintiff's favor pursuant to these findings, this being the judgment questioned by this appeal.

Upon the authority of an extended list of cases, 36 C. J. 263, Section 989, says that:

"As a rule, in order to constitute a constructive eviction, acts or omissions of a landlord in interference with his tenant's use and enjoyment must indicate an intention on his part that the tenant shall no longer continue to hold and enjoy the demised premises."

And the same text, 36 C. J. 262-263, Section 988, additionally says that:

"The landlord's interference with the tenant's use and enjoyment must be substantial and intentional, a mere trespass is not sufficient to constitute a constructive eviction. And the act or omission complained of must be that of the landlord, and not merely that of a third person acting without his authority or permission."

2 Tiffany's Landlord and Tenant, Section 185, Subsection (b), page 1259, likewise says:

"In order that an eviction may take place as a result of acts on the part of the landlord involving merely an interference with the tenant's possession and enjoyment as distinct from an actual dispossession, it is necessary that they be such as to indicate an intention on the landlord's part to deprive the tenant of the possession."

In Parke v. Proby, 130 Ill. App. 571, it is stated that:

"Actions of the landlord which will sustain a constructive eviction must be of a grave and permanent character, and done with the intention of depriving the tenant of the full enjoyment of the premises in an important and not a trivial matter. It must consist of an invasion of a material character, tending to make further occupation attendant with serious conse-

quences or continuing discomfort. Barrett v. Boddie, 158 Ill. 479; Kistler v. Wilson, 77 Ill. App. 149."

To the same effect, from the same jurisdiction, are the subsequent cases of Risser v. O'Connell, 172 Ill. App. 64; Saunders v. Fox, 178 Ill. App. 309.

It was held in Kelley v. Long, 18 Cal. App. 159, 122 P. 832, that the lessee of a ranch was not constructively evicted by the lessor's act in permitting a third person to use water rights appurtenant to the premises without the tenant's consent, where the interference with the latter's rights was brief and insignificant.

In Bookman v. Polachek, 165 N. Y. S. 1023, the court used this language:

"A constructive eviction occurs only where, through the landlord's acts, the tenant has been substantially deprived of the beneficial enjoyment of the demised premises. Not every breach of covenant or wrongful act on the part of the landlord constitutes an eviction. If a tenant has not actually been removed from the premises, he can establish an eviction only where he shows that the landlord's acts deprived him substantially of the consideration of the rental which he agreed to pay."

So the Supreme Court of Washington in Cline v. Altose, 158 Wash. 119, 290 P. 809, after reviewing a number of authorities, said:

"The foregoing cases plainly do not announce the rule that any interference by the landlord with the possession of the tenant, however slight, will work a constructive eviction, but on the contrary, hold that the interference must be of a substantial nature, and so far injurious to his rights as to deprive him of the beneficial use and enjoyment of the premises."

In Seaboard Realty Co. v. Fuller, 67 N. Y. S. 146, 147, the rule was stated:

"To constitute a constructive eviction, there must be an intentional and injurious interference by the land-

lord, which deprives a tenant of the beneficial enjoyment of the demised premises, or materially impairs such beneficial enjoyment. An eviction depends upon the materiality of the deprivation. If trifling, and producing no substantial discomfort or serious inconvenience, it will be disregarded, and will not afford cause for the termination of the relation of landlord and tenant. 11 Am. & Eng. Enc. Law (2d Ed.) 478."

Similarly in Lorenz v. McCloskey, 5 N. J. Misc. 27, 135 A. 350, the court declared:

"In Meeker v. Spalsbury, 66 N. J. Law, 63, 48 A. 1027, in a careful opinion by Justice Collins, quoting from other authorities therein cited, it is said:
" 'That eviction must be "not a mere trespass, but something of a grave and permanent character done by the landlord with the intention of depriving the tenant of the enjoyment of the demised premises", and * * * more fully and accurately defined as, "an act of a permanent character done by the landlord in order to deprive, and which had the effect of depriving, the tenant of the use of the thing demised, or of a part of it." ' "

Applying the principles of law announced by these authorities to the facts appearing in this record, we are unable to say that the judgment of the district court at present under review was so clearly erroneous as to require a reversal thereof at our hands.

It is apparent, we think, so far as the use of the basement under the Elk Theater is concerned, which appears to be that portion of the premises in question, concerning which the disagreement of the parties to this controversy took place, it was to be used by the lessor and lessee as needed by each of them and that for the most part, during the time the lessee was in possession of the premises, that was the way the matter was handled. The trial court was evidently of the opinion that the acts of Latham in conducting a few card games there "did not materially interfere with

the defendant's use of said property" and "were insufficient to constitute an eviction of the defendant" from the leased premises. The lessee did not protest to the card players when they asked him if he wanted them to get out. He could have, and we see no reason why he should not have done so. Kerby had moved his essential picture show equipment and his employee out of the leased premises and was using that property merely as a storage place for discarded equipment. Kerby himself testified, as we have seen, that he released the premises for the five year term, above specified, with the idea of keeping another picture show from getting possession of the property and so competing with his new theater, which he was at that time operating. The personal property belonging to Kerby and which had been moved by Latham and Mileski's son to one side and to another part of the basement was not, so far as can be told from the record, damaged at all, nor was it inaccessible to Kerby, for the latter subsequently got it and moved it away from the building.

Mileski, Jr., testified as above recited, that his father was the only one authorized to lease the premises, and that the elder Mileski did not know about the permission given to Latham to use the dressing rooms for running a card game at the time the arrangement was made. The father claims that as soon as he did know about the matter he stopped the game and Latham got out of the building. His presence there appears to have only been temporary; and it is certainly difficult to perceive that he was let in to this property with an intention on the lessor's part of evicting the lessee.

Accordingly we are constrained to affirm the judgment of the district court of Washakie County.

*Affirmed.*

KIMBALL and BLUME, JJ., concur.