**John E. SCOTT, Jr., Appellant (Plaintiff below),**

**v.**

**Donald B. PRAZMA, Appellee (Defendant below),**

**and**

**City of Casper  (Defendant below).**

**No. 4599.**

Supreme Court of Wyoming.

Oct. 25, 1976.

———◆———

Fred W. Layman, Casper, signed the brief and appeared in oral argument on behalf of the appellant.

Donald E. Chapin, Casper, signed the brief and appeared in oral argument on behalf of the appellee.

Before GUTHRIE, C. J., and Mc-CLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

The appellant-plaintiff Scott asked the district court for a declaratory judgment to determine the respective obligations of the plaintiff and the appellee-defendant, Prazma, under a commercial building lease arising because of demands made by the City of Casper under the City Building Code and safety regulations requiring conformity or vacation of the leased premises by the defendant. Plaintiff additionally claimed rentals accruing under the lease agreement, following defendant's quitting of the prem-

ises. From a judgment favoring the defendant, the plaintiff has appealed.[1]

The plaintiff-lessor claims that work on the building required by the building inspector was the obligation of the defendant-lessee under the terms of the lease which stipulate:

"It is understood and agreed by and between the parties that the Lessor shall not be required to make any repairs to the building or to the premises during the full term of this lease. The Lessee covenants and agrees that he will, at his own cost and expense, keep in good repair and condition, reasonable wear and tear alone excepted, the building and premises hereby leased during the full term of this lease, and that he will keep the buildings and premises hereinbefore described in a neat, clean and sanitary condition and will, at his own cost and expense, replace any glass in windows and doors that may become cracked or broken and, except for reasonable wear and tear and damage by fire or other unavoidable casualties, will at all times, at his own cost and expense, keep said premises in as good condition and repair as they are now.

\*     \*     \*     \*     \*     \*

"The Lessee covenants and agrees that he will, during the full term of this lease, manage and operate such business in a proper, lawful, businesslike manner and will abide by all the laws, rules and regulations of all governing bodies, Federal, State or municipal or any other, having jurisdiction over any of such businesses."

Contract provisions other than those quoted will be mentioned as we come to them.

The defendant Prazma claims that the action of the City of Casper requiring extensive work on the building and plaintiff's intractable refusal to correct the structural condition accordingly, amounted to his constructive eviction from the premises and

---

1. The complaint against the City of Casper was dismissed by the trial court; and the City of Casper is not a party to this appeal.

relieves him of any further liability; he secondarily asserts that plaintiff failed to mitigate damages.

We shall hold that there was a constructive eviction.

Plaintiff was the owner of a vacant building in Casper, Wyoming, in January of 1972. Defendant is an automobile body repairman then looking for a place to establish a new business. The parties met, negotiated and on February 4, 1972, entered into a lease of plaintiff's building for a period of ten (10) years at a rental of $700.00 per month. On March 1 of that year, defendant Prazma commenced the body shop business and continued to pursue his trade in the leased premises until August 30, 1974, when he permanently left and turned over possession of the building to plaintiff.

The first problem related to the building surfaced on receipt by both of the parties of a copy of a December 5, 1973, letter[2] from Fire Inspector Weckwerth of the City, in which he notified Leon Norris, the Building Inspector, that the roof of the leased building was leaking water onto live wires, the heat in the office was too close to the floor, the rain gutters were deteriorating, permitting water from the roof to enter live electrical installations, and that the hazardous conditions must be corrected for the safety of customers, employees and neighbors. Chief Weckwerth determined that the occupancy of the building should be handled as a dangerous building as provided by the Dangerous Building Code. Plaintiff's only discussion with the Fire Chief was to say the problems were defendant's, not his. There followed a memorandum and letters from the City of Casper on the condition of the building, and on January 15, 1974, a letter,[3] from City Building Inspector Norris to the appellant

2. The pertinent portion in full is:
"To mention some of the hazards, the following was noted:
"1. The roof is leaking causing water to run into live electrical installations.
"2. Rain gutters are deteriorated permitting water from the roof to enter live electrical installations.
"3. Paint spraying operations being conducted throughout the entire building.
"4. Heating equipment located in hazardous spray areas.
"5. Hot water heater located directly on floor in hazardous area.
"6. Paint and materials stored in hazardous manner and not in approved room in approved containers.
"7. Residue from exhaust system is collecting on neighboring building.
"8. Wall heater in office area mounted too close to floor.
"In my opinion the above listed hazardous conditions must be corrected for the safety of the customers, employees, and neighbors.
"I recommend this occupancy be handled as a dangerous building as provided by the Dangerous Buildings Code."

3. The letter in full is:
"The Fire Department and the Building Department of the City of Casper has inspected the operation of the Prazma Body Shop at 840 East Second Street and we find many existing hazards. At the time Mr. Prazma moved into the building it was inspected by the Fire Department and it was agreed that if he did all his painting in an approved booth he could use the building for a body shop. As you know, his business has increased to the extent that the building is no longer acceptable for this use as he is now painting outside of the booth. All the following items need to be done to make the building acceptable:
"1. The ceiling shall be of non-combustible material.
"2. All light fixtures shall be explosion proof.
"3. The cellar in the northwest corner should be sealed to prevent vapors from entering.
"4. The open flame heaters cannot be allowed in a spray area.
"5. Where people of a different sex occupy the building, two bathrooms are required by OSHA and the present bathroom is to be upgraded.
"6. The small wood structure in the rear will have to be removed for clearance.
"7. Section 1005 of Ordinance 1623-A requires that in all buildings customarily used by human beings and where flammable liquids are used, exhaust ventilation shall be provided sufficient to produce one complete change of air every 15 minutes. Such exhaust ventilation shall be taken from a point at or near the floor level.
"8. Two legal exists are required out of a building or room used for this purpose if the floor area exceeds 200 square feet.

specifying certain work needed to be done, including "the whole building needs upgrading" and with a mandate that if the work was not done within 60 days, the building would be ordered vacated.

Extensive remodeling of a major sort was directed by the Building Inspector according to a January 31, 1974 memorandum of the Building Inspector. The specifications there set out for remodeling,[4] among others, provided that all wooden framing around the front windows and the roof must be replaced, the latter for two reasons: (1) the existing roof would collapse in 20 minutes if fire were to occur, and (2) the roof leaked, causing water to drip into the electrical system. Additionally, eaves were to be replaced. It was also noted that existing brick walls were crumbling and leaning due to the erosion of the mortar.

Again, nothing was done by either party, although they did meet to discuss the contents of the January 15, 1974 letter from Mr. Norris to plaintiff and the remodeling specifications. Following a consistent pattern, plaintiff's interest was only to reassert his opinion that defendant should do the work required and that the City was nitpicking.

The matter came to a confrontation upon receipt by the parties of an April 17, 1974 letter [5] from Leon Norris, Chief

---

"9. As reported by the Fire Department, there is no doubt the roof needs fixing and the whole building needs upgrading.
"After a thorough inspection more hazardous items may be found, but regardless who is responsible for upgrading this building, upgrading will have to start within 60 days or the building will have to be ordered vacated. Ordinance 1623-A states that anyone failing to comply is guilty of a misdemeanor."

4. The memorandum is as follows:
"REMODELING SPECIFICATIONS: STRUCTURE LOCATED AT 840 EAST 2ND STREET
"1. Remove all heaters and replace with noncombustible heating system.
"2. Remove addition at north end of building as it constitutes a fire hazard.
"3. Install 2 separate restrooms.
"4. A ventilation system must be installed, in addition to the paint exhaust fan.
"5. All wooden framing around front windows must be replaced due to decaying of wood. All windows are ready to blow out after years of decay.
"6. Restroom in northwest corner must be removed as floor is decayed; occupant may fall into cellar under floor.
"7. Existing building to west of body shop must be removed, or visaversa [sic].
"8. Roof must be replaced for 2 reasons:
"(1) Body shop must maintain timber trus [sic] roof which burns at a ratio of ½ inch to 1 hour. Existing roof will collapse in 20 minutes if fire were to occur.
"(2) Roof is leaking, causing water to drip into electrical system. Many lights have been disconnected as water has entered light fixture.
"9. All eaves must be replaced on building.

"10. Existing brick walls are crumbling and leaning due to errosion [sic] of mortar.
"11. Office can not [sic] be contained in building as it constitutes a fire hazard.
"12. Cement block or brick wall must be installed dividing painting area from body repair area. Wall must be insulated in such a manner as to retain fire for four hours and all doors on said wall must be 4-hour fire doors. [Later corrected to 2-hour fire doors.]
"13. Paint must be stored in a room with a cement retaining wall constructed so that the fluid stored would not expell [sic] from room if it were spilled upon floor.
"14. Spraying area can not [sic] exceed 1,500 feet.
"A major remodeling should take place to continue the operations of this business."

5. The letter, in full, declared:
"A reinspection of the building housing your operation of auto body repair and spray painting was conducted at 11:00 a. m. on April 16, 1974 by the City of Casper's Building and Fire Departments.
"At this inspection it was observed that the previous requirements of both departments had not been complied with.
"One item that is more hazardous than some is the hot water tank installed at floor level. Within forty-eight (48 hours) after the delivery of this letter the tank shall be raised eighteen (18) inches above floor level or turned off and the valve sealed. Any failure to comply with this order shall cause the building to be vacated and posted until such time that said order is complied with by this department.
"As we mentioned before, the storage of all paints will have to be in separate rooms with proper fire protection, light fixtures, heaters, paint booths, etc.

Building Inspector, to Prazma Paint & Auto Body, Inc., in which, amongst other things, it was stated that:

"Also, it was noticed that since the last inspection, a large fracture has occurred in the west wall showing inadequate strength to resist wind pressure.

"At this inspection I was able to occupy the attic space for an inspection of the roof joists. The roof joists exceed the allowable span for 2 x 8 material by eight (8) feet and show signs of cracking and failure."

The order demanded that:

"Although they [roof joists] have withstood the wind and snow load for many years, each year and every load they become a little weaker. *It is my order that this building not be occupied through another winter.*

"* * * By order of the Building Official, this work shall be completed by September 1, 1974. * * *"
(Emphasis added.)

Following that letter, defendant gave notice on April 18, 1974, that he would evacuate the building on September 1, 1974.

It is obvious throughout the transcript of testimony and the exhibits that the building was in a badly deteriorated state, sorely in need of extensive structural repairs at a cost estimated and acknowledged to be about $60,000.00 for a new roof and roof structure alone. A basic difference between the litigants and a matter which was resolved favorably to the defendant by the trial court and is now the prime consideration of this court, is the obligation of the respective parties for the work necessary to be done for continued occupancy of the building by defendant. We will mention other facts necessary as we progress with the opinion. The question simplified is: Who, under the lease had the obligation to accomplish and pay for the massive rebuilding required by public edict? If the question is answered that it was the lessor's obligation, was there a constructive ejectment?

In 22 A.L.R.3d 521, appears an Annotation, "Who, As Between Landlord and Tenant, Must Make, or Bear Expense of, Alterations, Improvements, or Repairs Ordered by Public Authorities." As a general proposition, the annotation concludes that in most cases the holding depends upon an interpretation of the lease agreement between the landlord and tenant. We have found no case which holds categorically that either the lessor or the lessee is bound to make such repairs but each case must stand on its own. The annotation view is also ours and so we proceed from there.

The controlling rule depends upon the extent of defendant's duty in his covenants to repair and at the end of the term yield the premises "in as good condition and repair as when he took them, reasonable wear and tear and [d]amages [sic] by the elements alone excepted," united with the lease clause that he "abide by all the laws,

---

"Also, it was noticed that since the last inspection a large fracture has occurred in the west wall showing inadequate strength to resist wind pressure.
"At this inspection I was able to occupy the attic space for an inspection of the roof joists. The roof joists exceed the allowable span for 2 × 8 material by eight (8) feet and show signs of cracking and failure. [The rafters were in fact 2 × 10s. This item was retracted by the same inspector in August, 1974. He found that they could be satisfactorily repaired. However, the letter of withdrawal was not received in evidence because not presented at the pre-trial hearing. He did not rescind his order, however, nor were the cracked and failing joists ever repaired.]

"Although they have withstood the wind and snow load for many years, each year and every load they become a little weaker. It is my order that this building not be occupied through another winter.
"Chapter 4 of the Uniform Code for the Abatement of Dangerous Buildings requires that all required permits be secured therefor and the work physically commenced within such time (not to exceed sixty (60) days from the date of the order). By order of the Building Official, this work shall be completed by September 1, 1974. If the deficiencies are not corrected by that time, the building will be posted and vacated."

rules and regulations of all governing bodies, Federal, State or municipal." The right of the City Building Inspector to order use of the building discontinued if work be not done is not attacked and is not an issue here.

In 1 American Law of Property, 1952, § 3.80, pp. 353–354, it is said in excellent summary that:

"If the lessee does not expressly covenant to repair, it would seem clear that he generally should be under no duty to make alterations and repairs required by governmental authority in order to conform the premises to health and safety laws. Any changes likely to be ordered for this purpose would be beyond the scope of the tenant's common law duty to repair, and the expenses of compliance are properly regarded either as capital expenditures or as necessary carrying charges to be paid out of the rent. "Where the lessee covenants to repair, the question of who should bear the cost of compliance depends upon the nature of the alteration or improvement and the reason for requiring it. If the order involves mere repairs which the lessee would normally be required to make under his covenant, he should bear the cost. Likewise, the burden is on the lessee where the alteration is required only because of the particular use which he is making of the premises, although it may be questioned whether even in this case the courts would place the burden of extensive and lasting improvements on the lessee, except perhaps where the lease is for a long term. At any rate, if the order requires the making of such improvements, so-called 'structural' changes, and they are not required because of the particular use made of the premises by the lessee, the lessor must bear the burden of compliance."[6]

The lease in this case had about seven and a half years to run at the time defendant quit the premises. This is a relatively short time to justify the extensive repairs by the defendant, the greater benefit of which would revert to the plaintiff, and which are obviously inequitable and not within the contemplation of the parties. The plaintiff is not entitled to a remodeled building. The building had been constructed in 1939 or 1940 and as nearly as can be determined from the record, the roof and roof structure are the original, as are the eaves, rain gutters, window frames and windows, other than glass replaced. It appears that the listed original items would have a life of somewhere around 30–35 years.

While this court has never dealt with the question before us, it has had occasion to spell out the meaning of provisions in real property leases pertaining to obligations to repair as applicable to the habits and condition of our society and its circumstances. This court has, however, discussed lease covenants similar to those before us, namely, that the lessee here "will at his own cost and expense, keep in good repair and condition, reasonable wear and tear alone excepted, the building and premises hereby leased" and at the expiration of the lease will "quietly yield and surrender * * * the premises * * * in as good condition as when he took them, reasonable wear and tear by the elements alone excepted." *Fuchs v. Goe*, 1945, 62 Wyo. 134, 163 P.2d 783, 166 A.L.R. 1329. There, the history of those provisions was traced from the year 1327 and the ancient rule that fixed the harsh responsibility on the tenant to even replace an entire building lost by fire or other casualty through no fault of his.

In *Fuchs,* the court pointed out the more equitable doctrine is that such terms are

---

6. These principles were specifically approved in *Gaddis v. Consolidated Freightways, Inc.,* 1965, 239 Or. 553, 398 P.2d 749, 22 A.L.R.3d 514. (Extensive repairs would be inequitable ,to tenant, far from the "usual housekeeping variety.")

not technical and do not constitute an agreement to rebuild unless the term "repair" means to "replace" and it has no such meaning in its ordinary sense. To repair means to mend an old thing, not to make a new thing, "to restore to a sound state something which has become partially dilapidated, not to create something which has no existence." This court approved that concept and illustrated it by reference to an example given in another case where a carpenter contracts to repair a house or a mason a chimney, the ordinary construction would not be that they are hired to build a new house or a new chimney.

The court in *Fuchs* related these terms not so much to any particular meaning of the word "repair" but what the intention of the parties may have been when using it and pointed out that this court would not strain the term "repair" to reach a harsh result and impose some hidden meaning set as a trap not only for the careless businessman but also for one relying upon language as usually interpreted and that lessees should not become insurers. This court did not deem it wise to acquiesce in a rule whereby people would be surprised into contracts which neither party intended at the time of execution of the instrument.

We realize that the court there was talking about total loss of property and applying real property principles to personal property. But we are strongly attracted to the imprint by analogy that the case leaves on lease relationships.[7] We cannot believe that the parties ever intended at the time of the execution of the lease here that the defendant would be burdened with an immediate $60,000.00 obligation for a roof and related structure by himself, let alone the other items, to substantially restore the plaintiff's building by order of a public authority, of which there is any indication,

either expected. Even assuming that the defendant had the financial capability of proceeding with such an undertaking, it seems to be shockingly unforeseen that the defendant take the full strength of the impact.

We have no doubt but what some of the requirements of the Building Inspector can be attributed to defendant's adaptation of the building to his use. However, the replacement of an entire new roof to meet current higher than original standards, increasing the strength of roof supports to safely carry not only that load but the ceiling as well and replacement of rusted-out rain gutters, all necessary to prevent water from dangerously entering the electrical system, went to the basic structure of the building, regardless of the use. The addition of another restroom was the plaintiff's responsibility. It can hardly be argued that the employment of women placed that burden on the defendant. Women, as a part of any business establishment, can be expected and that is not unique to defendant's occupation. It logically is a capital investment for the benefit of the building, regardless of a particular occupancy. Rotting out of the floor under the existing restroom and decay around windows required to be replaced are of a structural nature resulting from the reasonable wear and tear caused by age and the elements of nature logically within the lease terms. We do not attempt to make a complete division of responsibility for each item listed by the Building Inspector but confine ourselves only to those obviously chargeable to the landlord-plaintiff and of major import. Perhaps, the parties would have been willing to proceed along with the building in its dangerously broken-down condition, but City action has hastened an immediate division of responsibility. All of these items

---

7. The plaintiff cites *Meador v. Blonde*, 1926, 34 Wyo. 397, 244 P. 222, in which this court construed a provision of a lease: "to pay each and every obligation of debt incurred or contracted for the heating of the entire building, * * *." We think the court correct in holding that to be an absolute agreement, without conditions, and that the tenant should pay for extensive repairs when he apparently let the hot water or steam heat furnace run dry. We can see no comparison to the case before us.

the plaintiff consistently rejected as any responsibility of his even during his testimony; these, he asserted, were exclusively his lessee's problems. Such a position is obviously unfair because it would give plaintiff a better, fully reconstructed building than he leased, the life of which improvements would extend far beyond the defendant's remaining term of less than eight years. It would become far superior to its condition at the date of the lease. By the express terms of the agreement, defendant's obligation was only to keep it in its lease-date condition. It had taken over 30 years for the building to reach its present dilapidated state.[8] Patching was no longer feasible for major items; reasonable wear and tear had taken its toll. The leasehold is worthless if the lessee cannot occupy the premises. The defendant correctly sized up the situation when, in his testimony, he said, "I couldn't afford to fix up this building *for Mr. Scott.*" (Emphasis supplied.) Nor was he required to.

The cases are generally in accord with the view just expressed. Under comparable leasehold terms in *Patteson v. McGee,* Tex.Civ.App.1961, 350 S.W.2d 241, the state health department ordered major repairs and improvements or vacate. The court held that the lease contract obligated the lessee to maintain the building in the same state of repair as she received it but the lessee had not agreed to pay for major and expensive improvements. In *Taylor v. Gunn,* 1950, 190 Tenn. 45, 227 S.W.2d 52, was a 10-year lease. There, the state fire marshal ordered the entire front of the building razed and rebuilt with structural changes and that chimney flues be closed

and new ones built. As here, when the fire marshal made that demand, the building was in the same condition as when leased. The court held the required work to be done at the expense of the landlord and said that the rule which exempts him from liability relates only to ordinary repairs but where public authority demands structural changes and improvements which are permanent, extensive and add materially to the value of the property, such repairs are not within the contemplation of the parties as an expense of the lessee and not chargeable to the tenant.

We note that the lease, here, provided specially that " * * * no structural changes may be made without the written consent of the Lessor first had and obtained, * * *." In *Taylor* that provision was considered to be a further expression of intent that structural changes were to receive different consideration than ordinary repairs. In *Kanes v. Koutras,* 1948, 203 Ga. 570, 47 S.E.2d 558, the landlord refused to make 13 structural corrections ordered by city officials. The lease provided that the lessee accepted the property by the terms of the lease "as is" and "No repairs either to exterior or interior to be made by the lessor during the life of this lease." The lease also provided that lessee was to make no changes without the consent of the lessor and comply with all rules, regulations and ordinances passed by a city government. The court decided that both parties were charged with knowledge that the city could take the action it did and they both took a chance. The court considered it an injustice to require the lessor to make the corrections and an injustice on the part of the defendant-lessee

---

8. The condition of the roof became almost unbelievable. The defendant testified that his father was frequently (25 or 30 times) on the roof patching and applying tar. The wind often blew off large chunks of it and on occasion, defendant had to bring in customers' cars to keep the falling pieces from doing them damage. On the roof were old abandoned air conditioner enclosures which had rusted out and it was possible to see daylight through them. The toilet floor area was so rotted that users were fearful that the occupied fixtures would fall through while in service. The ravages of time and elements had near finished their work.

to continue paying rent. It was held that the city's order justified the tenant in terminating the lease.

■ An ordinary covenant to keep the premises in good repair does not include the restoration of a part of a building which has become so run-down that it cannot be repaired. *Younger v. Campbell,* 1917, 177 App.Div. 403, 163 N.Y.S. 609. Ordinary wear and tear include any usual deterioration from the use of the premises and by the lapse of time. *Miller v. Belknap,* 1954, 75 Idaho 46, 266 P.2d 662. In *Mid-Continent Life Insurance Company v. Henry's, Inc.,* 1974, 214 Kan. 350, 520 P.2d 1319, it was held that the lessee should not be required to bear the expense of alterations ordered by governmental authority where:

"* * * (1) the improvements were substantial and structural in nature; (2) the improvements will survive the term of the lease between lessor and lessee and thus will inure to the primary benefit of the lessor; (3) the improvements were not required by or because of any particular use made of the premises by the lessee; (4) the cost of such improvements were substantial as opposed to nominal; and (5) the event which necessitated the improvement was unusual, extraordinary and unexpected and not within the contemplation of the parties at the time the lease was executed."

We hold that to be the rule of this case and the facts here fit every criteria listed.

Since there was an obligation upon the plaintiff to bear the expense of substantial repairs to the basic structure of the leased building and he adamantly refused to comply with any part of the official order, was there a constructive eviction?

Without stating any preference for any one of several definitions with substantially the same thrust it approved, this court in *Mileski v. Kerby,* 1941, 57 Wyo. 109, 113 P.2d 950, adopted the following:

"* * * 'A constructive eviction occurs only where, through the landlord's acts, the tenant has been substantially deprived of the beneficial enjoyment of the demised premises. Not every breach of covenant or wrongful act on the part of the landlord constitutes an eviction. If a tenant has not actually been removed from the premises, he can establish an eviction only where he shows that the landlord's acts deprived him substantially of the consideration of the rental which he agreed to pay.' "

We think this best fits the circumstances of this case. For many other definitions of a similar nature, see 8A Words and Phrases, beginning at page 518 and pocket-part.

Here, the defendant-tenant was deprived of the means or power of beneficial enjoyment of the premises, materially impaired by the plaintiff's acts in refusal to meet City standards. It is a question of fact to be determined by the trier of the facts.[9] *Myers v. Western Farmers Association,* 1969, 75 Wash.2d 133, 449 P.2d 104.

■ Constructive eviction involves the surrender of possession by the lessee on justifiable grounds rather than a deprivation of actual occupancy by direct action of the landlord. Grounds must amount to a substantial interference with possession or enjoyment. They were substantial here. An eviction by the lessor suspends the lessee's obligation to pay rent and the lessee may treat the lease as terminated, relieving him of paying any rent by its terms required. This rule applies to constructive

9. The trial judge here specifically found: "3. That each party consistently took the position that it was the others [sic] obligation to meet the City's requirements, maintaining that he had no duty to do so himself, after repeated demands by the City, and with the prospect of a condemnation and order to cease use of the premises, the defendant, Donald B. Prazma, moved out: to fix the building to meet the City's requirements would have cost a medium five figure sum. "4. The court concludes that there was a constructive eviction."

as well as actual eviction. 1 American Law of Property, § 3.52, pp. 283–284; *Sewell v. Hukill*, 1960, 138 Mont. 242, 356 P.2d 39. Upon his departure from the premises, the defendant's obligation to pay rent terminated and we so hold.

■ There is some language in *Mileski v. Kerby*, supra, indicating that there must be an intent on the part of the landlord to deprive the tenant of the enjoyment and use of the premises before there can be a constructive eviction. That does not mean there must be an actual subjective intention in the mind of the landlord. It may be inferred from the character of the lessor's acts if their natural and probable consequences are such as to deprive the lessee of the use and enjoyment of the leased premises. Where the acts of the lessor effectively deprive the lessee of the premises, the intent to evict is implied from the character of the acts done. *Sewell v. Hukill*, supra; *Pierce v. Nash*, 1954, 126 Cal. App.2d 606, 272 P.2d 938; *Thirteenth & Washington Sts. Corp. v. Neslen*, 1953, 123 Utah 70, 254 P.2d 847; *Westland Housing Corporation v. Scott*, 1942, 312 Mass. 375, 44 N.E.2d 959. In the *Neslen* case, it was noted that intent is ordinarily of a purely legal nature inferred from the character of the landlord's acts.

■ There is an abundance of cases specifically holding that refusal of the landlord to do public-ordered work under circumstances comparable or similar to those before us constitutes constructive eviction. *Polk v. Armstrong*, Nev.1975, 540 P.2d 96 (refusal to construct wall required by city); *Magnolia Warehouses of Alabama v. Morton Realty Company*, 1960, 102 Ga.

App. 697, 117 S.E.2d 552 (landlord refused to place safety devices on elevator); *Gans v. L. Olchin & Company*, 1929, 109 Conn. 164, 145 A. 751, 63 A.L.R. 428 (failure to install additional exit in factory required by department of labor); *New Chester Theatre Corporation v. Bischoff*, 1924, 210 App.Div. 125, 205 N.Y.S. 641 (failure to build according to regulations of building code); *Galland v. Shubert Theatrical Co.*, 1918, 105 Misc.Rep. 185, 172 N.Y.S. 775, affd. 1927, 220 App.Div. 704, 221 N.Y.S. 437 (reconstruction of theater balcony.) In *Johnson v. Snyder*, 1950, 99 Cal.App.2d 86, 221 P.2d 164, the court held there was a constructive eviction where the city health officer ordered the plaintiff to close his restaurant in a stall rented from defendant because of dirty and unsanitary conditions allowed by defendant to exist in other parts of the building not leased by plaintiff. While the facts in *Johnson* are different, the analogy shows the nature of constructive eviction.

There was constructive eviction by the plaintiff in his failure to do substantial work required by lease covenants following the application of City pressures. Since we hold that there was constructive eviction, there is no requirement that the lessee pay rent after a constructive eviction. We therefore need not reach the question of mitigation of damages by landlord raised by defendant in that plaintiff has made no effort to re-lease the property. Plaintiff had steadfastly asserted that the building is defendant's for the full unexpired term and he is entitled to rental during each and every month of the entire time of 10 years.

There was no error.

Affirmed.