59 P.3d 611 (2002)
Linda ROBEL, Petitioner,
v.
ROUNDUP CORPORATION, d/b/a Fred Meyer, Inc., Respondent.
No. 70561-5.
Supreme Court of Washington, En Banc.
Argued May 31, 2001.
Decided December 12, 2002.
*613 Delay Curran Thompson Pontarolo & Walker, Michael Walker, Spokane, for Petitioner.
Allen & McLane PC, Keller Allen, Spokane, for Respondent.
*612 OWENS, J.
This court is asked to decide whether the Court of Appeals correctly reversed a bench trial judgment for petitioner Linda Robel on her claims for disability harassment, retaliation for filing a workers' compensation claim, negligent and intentional infliction of emotional distress, and defamation. We hold that Washington's Law Against Discrimination, chapter 49.60 RCW (the antidiscrimination statute), supports an employee's disability based hostile work environment claim, and conclude that the trial court's unchallenged findings of fact satisfy the elements of such a claim. We likewise conclude that the trial court's unchallenged findings support Robel's claim that Fred Meyer retaliated against her for filing a workers' compensation claim. Regarding Robel's claim for intentional *614 infliction of emotional distress, we reject the conclusion of the Court of Appeals that the claim should not have gone to the trier of fact. Because the trial court's findings on the elements of outrage went unchallenged, we reinstate the trial court's decision in Robel's favor on her outrage claim and, consequently, will not reach the claim for negligent infliction of emotional distress. However, because we agree with the Court of Appeals that the allegedly defamatory communications cited in the trial court's findings of fact were not capable of defamatory meaning, we affirm the reversal of the trial court's judgment on the defamation claim. We deny Robel's request for costs and reasonable attorney fees on appeal.

FACTS
The suit arises out of Linda Robel's employment from May 31, 1995, to September 12, 1996, in the service deli at the Francis Avenue Fred Meyer store in Spokane. On July 14, 1996, Robel sustained a workplace injury and timely filed a workers' compensation claim. In late July, Robel was given a light-duty assignment, "a four-hour shift" during which she stood "at a display table outside the deli area offering samples of food items to customers." Clerk's Papers (CP) at 1333 (Finding of Fact 22). On August 1, 1996, as Robel worked at the display table, two deli workers "laughed" and "acted out a slip and fall," as "one of them yelled `Oh, I hurt my back, L & I, L & I!'" Id. (Finding of Fact 23); see also Joint Ex. 201, at 30. They "audibly called [Robel] a `bitch' and `cunt.'" Id. They also "told customers she had lied about her back and was being punished by Fred Meyer by `demoing' pizzas." Id. In journal entries for August 2, 3, 10, and 11, Robel wrote that assistant deli manager Amy Smith and others made fun of her, laughed, pointed, and gave her "dirty looks." Joint Ex. 201, at 30-33. Robel also noted that on August 13, Smith and other deli workers would "stare at [her], whisper out loud, & laugh, pretend to hurt their backs & laugh." Id. at 34.
Robel reported the incidents to her union representative, Ron Banka. According to Robel's journal, Banka came in on August 14, 1996, and set up a meeting with Steve Wissink, the store director, for Friday, August 16. After the brief meeting, Banka stopped by the deli and told Robel that Wissink was convening a meeting of all deli employees on August 19, 1996. At that meeting, Wissink warned the employees that future harassment could result in termination. On August 22, 1996, deli workers "laughed and audibly admonished each other not to harass Robel." CP at 1333 (Finding of Fact 25); Joint Ex. 201, at 35. On August 28 and 30, Robel noted in her journal that co-workers were talking about her and laughing at her, and she recorded that, on September 2, Smith and other workers "had a great time making fun of [her], calling [her] names[,] pretending to hurt their backs & yelling L & I." Joint Ex. 201, at 35-36, 38. On September 13, 1996, Robel secured a two-week work release from her doctor and gave it to Smith that same day. Before Robel left the deli, she overheard Smith comment to other deli employees, "`Can you believe it, Linda's gonna sit on her big ass and get paid.'" CP at 1333 (Finding of Fact 27); see also Joint Ex. 201, at 40.
Robel again contacted Banka, who in turn contacted Wissink on September 20, 1996.[1] On September 24, Wissink telephoned Robel to confirm the allegations. Robel "told him about the C word and Bitch[,] the little plays they were doing about [her] back." Joint Ex. 201, at 40. On September 28, 1996, Wissink terminated one employee. Robel never returned to work at Fred Meyer.
On February 13, 1998, Robel filed suit against Fred Meyer, stating claims for disability discrimination (RCW 49.60.180(3)), retaliation for filing a workers' compensation claim (RCW 51.48.025(1)), negligent and intentional infliction of emotional distress, and defamation. The trial court denied Fred Meyer's motion for summary judgment. At the close of a three-day nonjury trial in September 1999, the court entered 69 findings *615 of fact and 8 conclusions of law. Finding for Robel on all five causes of action, the court awarded Robel $1,902.50 in special damages and $50,000.00 in general damages, along with her reasonable attorney fees and costs.
Fred Meyer appealed. The Court of Appeals reversed the trial court's judgment on all claims. Robel v. Roundup Corp., 103 Wash.App. 75, 10 P.3d 1104 (2000). We granted Robel's petition for review.

ISSUES
(1) Does the antidiscrimination statute support an employee's disability based hostile work environment claim? If so, did the trial court's unchallenged findings of fact support its conclusion of law that Fred Meyer discriminated against Robel based upon her physical disability?
(2) Did the trial court's unchallenged findings of fact support the conclusion that Fred Meyer, in violation of RCW 51.48.025(1), retaliated against Robel for filing a workers' compensation claim?
(3) Did the Court of Appeals properly hold as a matter of law that Robel's claim for intentional infliction of emotional distress should not go to the trier of fact?
(4) Were the allegedly defamatory communications cited in the trial court's findings of fact capable of defamatory meaning?

ANALYSIS
Standard of Review. Fred Meyer assigned error to all of the trial court's conclusions of law but challenged none of its findings of fact. Br. of Appellant at 1-2. Unchallenged findings are verities on appeal. State v. Stenson, 132 Wash.2d 668, 697, 940 P.2d 1239 (1997); State v. Hill, 123 Wash.2d 641, 644, 647, 870 P.2d 313 (1994). This court reviews de novo Fred Meyer's challenges to the trial court's conclusions of law. State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996). Because "[a] conclusion of law is a conclusion of law wherever it appears," any conclusion of law erroneously denominated a finding of fact will be subject to de novo review. Kane v. Klos, 50 Wash.2d 778, 788, 314 P.2d 672 (1957); see also Local Union 1296, Int'l Ass'n of Firefighters v. City of Kennewick, 86 Wash.2d 156, 161-62, 542 P.2d 1252 (1975).
Disability Discrimination. Under the antidiscrimination statute, "[i]t is an unfair practice for any employer ... [t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability." RCW 49.60.180(3) (emphasis added). This court has recognized that the antidiscrimination statute prohibits sexual harassment in employment, with such claims being "generally categorized as `quid pro quo harassment' claims or `hostile work environment' claims." DeWater v. State, 130 Wash.2d 128, 134-35, 921 P.2d 1059 (1996) (quoting Payne v. Children's Home Soc'y of Wash., Inc., 77 Wash.App. 507, 511 n. 2, 892 P.2d 1102, review denied, 127 Wash.2d 1012, 902 P.2d 164 (1995)). Whether the antidiscrimination statute supports a disability based hostile work environment claim is an issue of first impression in this state. In reviewing Robel's claim below, Division Three of the Court of Appeals assumed arguendo that the antidiscrimination statute "encompasse[d] a hostile environment claim based on a disability" but concluded that the findings of fact did not support such a claim. Robel, 103 Wash.App. at 86-87, 10 P.3d 1104. We hold that the antidiscrimination statute supports a disability based hostile work environment claim, and conclude that the trial court's unchallenged findings of fact satisfied each element of the claim.
To determine whether the antidiscrimination statute supports a disability claim based on a hostile work environment, we may look to federal cases construing analogous federal statutes. Fahn v. Cowlitz County, 93 Wash.2d 368, 376, 610 P.2d 857 (1980), 621 P.2d 1293 (1980). A number of federal courts have considered whether the Americans with Disabilities Act of 1990 (the ADA, 42 U.S.C. § 12101) supports a disability claim based on the employer's creation of a hostile *616 work environment.[2] The ADA forbids discrimination that impacts a disabled person's "terms, conditions, and privileges of employment," a phrase likewise found in Title VII of the Civil Rights Act, which forbids discrimination based on an employee's race, color, religion, sex, or national origin. 42 U.S.C. § 12112(a), § 2000e-2(a)(1). The United States Supreme Court has interpreted the language in Title VII to prohibit harassment that is so "severe and pervasive" as to alter the conditions of employment and create a hostile work environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). When asked to extend to ADA plaintiffs this same protection afforded under Title VII, most federal courts have recognized a hostile work environment claim under the ADA and have applied the Title VII standards to those claims.[3]
The antidiscrimination statute, which applies with equal force to sex based and disability based employment discrimination, is analogous to Title VII and the ADA. Setting forth the elements that a plaintiff must prove "[t]o establish a work environment sexual harassment case" under the antidiscrimination statute, this court noted that, although federal cases interpreting Title VII were "not binding on this court," they were "instructive" and "support[ive]." Glasgow v. Georgia-Pac. Corp., 103 Wash.2d 401, 406 & n. 2, 693 P.2d 708 (1985). In Glasgow, we determined that a sexual harassment plaintiff must prove (1) that "[t]he harassment was unwelcome," (2) that it "was because of sex," (3) that it "affected the terms or conditions of employment," and (4) that it was "imputed to the employer." Id. at 406-07, 693 P.2d 708; see also Fisher v. Tacoma Sch. Dist. No. 10, 53 Wash.App. 591, 769 P.2d 318 (applying Glasgow factors to race based discrimination), review denied, 112 Wash.2d 1027 (1989). Just as the federal cases extended the Title VII hostile work environment claim (and its standards of proof) to the ADA, we may extend the reasoning in Glasgow to disability claims and conclude that, under the antidiscrimination statute, a plaintiff in a disability based hostile work environment case must prove (1) that he or she was disabled within the meaning of the antidiscrimination statute, (2) that the harassment was unwelcome, (3) that it was because of the disability, (4) that it affected the terms or conditions of employment, and (5) that it was imputable to the employer. The finder of fact must determine whether the plaintiff has met his or her burden as to each of these elements. See 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.23, at 240 (1997) (WPI).
The question thus before us is whether the trial court's findings of fact establish all five elements of Robel's disability based hostile work environment claim. The only applicable findings are those pertaining to employee conduct occurring after Robel's workplace injury on July 14, 1996. The first element, that Robel's injury was a disability under RCW 49.60.180(3), was not contested. To satisfy the second element, proof that the conduct was "unwelcome," the plaintiff must show that he or she "did not solicit or incite it" and viewed it as "undesirable or offensive." Glasgow, 103 Wash.2d at 406, 693 P.2d 708; cf. 6A WPI 330.23, at 240 (requiring jury to find that plaintiff proved "[t]hat this language or conduct was unwelcome in the sense that the plaintiff regarded the conduct as undesirable and offensive, and did not solicit or incite it"). This element is fully met in the findings. No findings suggested that Robel solicited or incited the remarks made about her workplace injury. That she viewed it as undesirable and offensive was at *617 least implicit in her reporting the conduct to Banka, but the trial court explicitly found that "[t]he harassment of Robel in the work setting was unwelcomed" and "offensive." CP at 1335-36 (Findings of Fact 41, 44).
The third element, that the harassment occurred "because of" the workplace injury, "requires that the [disability] of the plaintiff-employee be the motivating factor for the unlawful discrimination." Glasgow, 103 Wash.2d at 406, 693 P.2d 708. This element thus requires a nexus between the specific harassing conduct and the particular injury or disability. Satisfying the element that the conduct "occurred because of [the plaintiff's disability]," the trial court found that "[t]he verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, was directly or proximately related to her disability and/or Fred Meyer's perception of Robel as disabled." CP at 1334 (Finding of Fact 31) (emphasis added). For us to conclude that this unchallenged finding failed to satisfy the third factor, we would have to make the very fine-grained distinction that the finding's description of the harassment as "directly or proximately related to" the disability did not mean that the harassment was "because of" the disability. We decline to split that hair. Because this clear factual finding was not challenged on appeal, we are not at liberty to substitute our judgment for that of the trial court.
Of the fourth element, whether the conduct affected the terms and conditions of employment, the Glasgow court explained that "[t]he harassment must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." 103 Wash.2d at 406, 693 P.2d 708. As indicated in the pattern jury instruction, based on RCW 49.60.180(3) and Glasgow, a satisfactory finding on this element should indicate "[t]hat the conduct or language complained of was so offensive or pervasive that it could reasonably be expected to alter the conditions of plaintiff's employment." 6A WPI 330.23, at 240. The trial court found that "Fred Meyer created a hostile and abusive work environment" and that the environment "was offensive to Robel." CP at 1335-36 (Findings of Fact 43-44). Another finding states that "Fred Meyer discriminated against Robel in the terms or conditions of employment when it participated in and/or failed to bring to an end ... the verbal and non-verbal harassment of Robel in the work setting." CP at 1336 (Finding of Fact 48). Describing the employer's conduct as "offensive" enough to affect Robel's "terms or conditions of employment" and "create[] a hostile and abusive work environment," these findings echo the critical language from Glasgow and the pattern jury instruction. We cannot pretend that the trial court failed to make the necessary findings on this element of the disability based hostile work environment claim. Because no error was assigned to these findings, we accept them as verities and forgo any reweighing of the evidence supporting them.[4]
The fifth element, whether the postinjury conduct must be imputed to the employer, was explained in Glasgow as follows:
Where an owner, manager, partner or corporate officer personally participates in the harassment, this element is met by such proof. To hold an employer responsible for the discriminatory work environment created by a plaintiff's supervisor(s) or co-worker(s), the employee must show that the employer (a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action.
103 Wash.2d at 407, 693 P.2d 708. Applying this passage, the jury must find either that (1) "an owner, manager, partner or corporate officer personally participate[d] in the harassment" or that (2) "the employer ... authorized, knew, or should have known of the harassment and ... failed to take reasonably prompt and adequate corrective action." *618 Id. (emphasis added); see also 6A WPI 330.23, at 240-41.
The trial court found that "Fred Meyer, through the acts of its managers, participated, authorized, knew and/or should have known of the verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996." CP at 1335 (Finding of Fact 38) (emphasis added); see also CP at 1336 (Finding of Fact 46) (stating that "Fred Meyer's management personnel improperly participated in and/or allowed the verbal and non-verbal harassment in the work setting"). The trial court clarified in its oral review of the findings that deli manager Potts and assistant deli manager Smith were management personnel for purposes of employer liability.[5] The court also found that "Fred Meyer's remedial action ... was not of such a nature to have been reasonably calculated to end the harassment" and that "[i]ts investigations and termination of [one co-worker] without further management corrections were inadequate." CP at 1335 (Finding of Fact 40). Moreover, the court specifically found that the postinjury harassment was "imputed to Fred Meyer." Id. (Finding of Fact 39) (emphasis added). These uncontested findings of fact satisfy both options derived from Glasgow.
We therefore conclude that RCW 49.60.180(3) supports a disability based hostile work environment claim and that the Court of Appeals erred when it ignored the trial court's unchallenged findings of fact on the five essential elements of the claim. We reverse the Court of Appeals and reinstate the trial court's judgment in Robel's favor on this claim.
Retaliation for Filing Workers' Compensation Claim. Washington's Industrial Insurance Act provides that "[n]o employer may discharge or in any manner discriminate against any employee because such employee has filed or communicated to the employer an intent to file a claim for compensation or exercises any rights provided under this title." RCW 51.48.025(1) (emphasis added). Robel asserts that, although Fred Meyer did not discharge her for filing her workers' compensation claim, the company did "in [some] manner discriminate against" her "because" she filed her workers' compensation claim. Id.; see City of Seattle v. Williams, 128 Wash.2d 341, 349, 908 P.2d 359 (1995) (courts "are duty-bound to give meaning to every word that the Legislature chose to include in a statute and to avoid rendering any language superfluous"). The trial court made the following unchallenged findings:
34. Fred Meyer has a policy that retaliation by supervisors against employees is precluded when complaints are raised by employees. Fred Meyer failed and/or refused to enforce this policy in response to the verbal and non-verbal harassment of Robel in the work setting.
35. Fred Meyer's actions and/or inactions in regard to the verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, was an unlawful act of retaliation in response to her filing and/or pursuing an industrial insurance claim under RCW 51, et seq., a statutorily protected activity.

36. The verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, constituted an unlawful and adverse employment action against her.
37. There exists a direct causal connection between Robel's protected activity and the adverse employment action.
CP at 1334-35 (Findings of Fact 34-37) (emphasis added).
*619 Without commenting on these unchallenged findings, which respond directly to the antidiscrimination statute, the Court of Appeals determined that Robel would have to provide "`either (a) proof of a policy or practice of the employer, known to the employee, by which the employer retaliates against employees who exercise their rights under the workers' compensation law; or (b) [proof] that the employee sustains an on-the-job injury, and is directly threatened with retaliation if the employee claims benefits under the workers' compensation law for the injury.'" Robel, 103 Wash.App. at 88, 10 P.3d 1104 (quoting Johnson v. Safeway Stores, Inc., 67 Wash.App. 10, 13, 833 P.2d 388 (1992)).
The reliance on Johnson is insupportable. At issue there was the employer's conduct in preventing an employee from filing a claim, a circumstance not presented here. In fact, no prior cases have applied the antidiscrimination statute to the present situationthat of an employer who has allegedly discriminated in some way, short of discharge, against an employee because she filed a workers' compensation claim. By analogy with Wilmot v. Kaiser Aluminum & Chemical Corp., 118 Wash.2d 46, 68, 821 P.2d 18 (1991), which required proof of a causal connection between the filing of a claim and the allegedly retaliatory termination, Robel was required to prove that she had filed a claim, that Fred Meyer thereafter discriminated against her in some way,[6] and that the claim and the discrimination were causally connected. Because the findings of fact satisfy these elements and were not challenged on appeal, we reverse the Court of Appeals on the retaliation claim and reinstate the trial court's judgment in Robel's favor.
Intentional Infliction of Emotional Distress. Robel's complaint stated causes of action for both negligent and intentional emotional distress, basing those claims on the same averments. In the trial court's oral review of its findings, it stated that, "[w]ith regard to the negligence and intentional infliction claim, [it] would recognize [that the] conduct rises to the level of being intentional, particularly as it relates to management of [sic] employee Smith and conduct that took place in the direct presence of management employee Potts." Report of Proceedings (RP) at 553. The trial court entered judgment in Robel's favor on both claims, but the Court of Appeals reversed.
To prevail on a claim for outrage, a plaintiff must prove three elements: "(1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) severe emotional distress on the part of the plaintiff."[7] The first element requires proof that the conduct was "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (quoting Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975)). Although the three elements are fact questions for the jury, this first element of the test goes to the jury only after the court "determine[s] if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." Id. Here, the trial court entered factual findings in Robel's favor on the three elements, CP at 1336-37 (Findings of Fact 51, 52, 57, 59, 60), but the Court of Appeals reversed, determining as a matter of law that "reasonable minds could not differ on whether the conduct was so extreme as to result in liability." Robel, 103 Wash.App. at 90, 10 P.3d 1104.
*620 While the standard for an outrage claim is admittedly very high (by which we mean that the conduct supporting the claim must be appallingly low), we disagree with the Court of Appeals on the threshold legal question and conclude that reasonable persons could deem the employer's conduct, as set forth in the unchallenged findings, sufficiently outrageous to trigger liability. In some contexts, perhaps the language directed at Robel could be dismissed as merely "rough" and "insulting," as the Court of Appeals characterized it, Robel, 103 Wash.App. at 90, 10 P.3d 1104, but we believe that reasonable minds (such as the one exercised by the trial judge) could conclude that, in light of the severity and context of the conduct, it was "beyond all possible bounds of decency, ... atrocious, and utterly intolerable in a civilized community." Dicomes, 113 Wash.2d at 630, 782 P.2d 1002 (quoting Grimsby, 85 Wash.2d at 59, 530 P.2d 291). This court has recognized that in an outrage claim "[t]he relationship between the parties is a significant factor in determining whether liability should be imposed." Contreras v. Crown Zellerbach Corp., 88 Wash.2d 735, 741, 565 P.2d 1173 (1977). The Contreras court emphasized that "added impetus" is given to an outrage claim "[w]hen one in a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments." Id.; see also White v. Monsanto Co., 585 So.2d 1205, 1210 (La.1991) (stating that "plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger"). Robel was called in her workplace names so vulgar that they have acquired nicknames, such as "the C word," for example. Joint Ex. 201, at 40; cf. Taylor v. Metzger, 152 N.J. 490, 706 A.2d 685, 695-96 (1998) (holding that, in light of "power dynamics of the workplace," jury could reasonably find "extreme and outrageous" a sheriff's utterance of a single racial slur about subordinate officer). Thus, on the threshold question of law, we conclude that reasonable minds could differ on whether the conduct was sufficiently extreme to warrant the imposition of liability on the employer. The claim was properly before the finder of fact, and the trial court's unchallenged factual findings on the elements of intentional infliction of emotional distress are verities on appeal.
Fred Meyer argued to the Court of Appeals that, "[i]n Washington, an employer is generally not, as a matter of law, liable for an intentional tort committed by an employee." Opening Br. of Appellant at 33 (citing Kuehn v. White, 24 Wash.App. 274, 278, 600 P.2d 679 (1979)). This point of view gravely distorts the law of vicarious liability in this state. Our case law makes clear that, once an employee's underlying tort is established, the employer will be held vicariously liable if "the employee was acting within the scope of his employment." Dickinson v. Edwards, 105 Wash.2d 457, 469, 716 P.2d 814 (1986). An employer can defeat a claim of vicarious liability by showing that the employee's conduct was (1) "intentional or criminal" and (2) "outside the scope of employment." Niece v. Elmview Group Home, 131 Wash.2d 39, 56, 929 P.2d 420 (1997) (emphasis added), quoted with approval in Snyder v. Med. Servs. Corp. of E. Wash., 145 Wash.2d 233, 242-43, 35 P.3d 1158 (2001). Niece and, by extension, Snyder simply do not stand for the proposition that intentional or criminal conduct is per se outside the scope of employment.[8]
*621 An employee's conduct will be outside the scope of employment if it "is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." RESTATEMENT (SECOND) OF AGENCY § 228(2) (1958); see also RESTATEMENT, supra, § 228(1). This is not to say that an employer will be vicariously liable only where it has specifically authorized an employee to act in an intentionally harmful or negligent manner; likewise, an employer may not insulate itself from vicarious liability merely by adopting a general policy proscribing bad behavior that would otherwise be actionable. The proper inquiry is whether the employee was fulfilling his or her job functions at the time he or she engaged in the injurious conduct. For example, in Kuehn, the employee, a truck driver, stepped outside the scope of his employment when, following an exchange of obscene gestures, he ran the plaintiff's car off the road and, after both vehicles had stopped, assaulted the plaintiff with a pipe. The Kuehn court observed that, when a servant "steps aside from the master's business in order to effect some purpose of his own, the master is not liable." 24 Wash.App. at 277, 600 P.2d 679. Similarly, this court has also determined that, where an employee's acts are directed toward personal sexual gratification, the employee's conduct falls outside the scope of his or her employment. For example, in Thompson v. Everett Clinic, 71 Wash.App. 548, 860 P.2d 1054 (1993), the court held that the actions of a doctor who, for his own personal sexual gratification, had manually obtained sperm samples from his male patients during examination were not within the scope of the doctor's employment.[9]
Here, Fred Meyer was vicariously liable for the offending conduct of its deli employees. First, unlike the employee in Kuehn, who left his post and effectively ceased to be an employee, the Fred Meyer deli workers tormented Robel on company property during working hours, as they interacted with co-workers and customers and performed the duties they were hired to perform. Nothing in the record suggests that the abusive employees left their job stations or neglected their assigned duties to launch the verbal attacks on Robel. Nor was the employees' conduct in this case directed toward deriving personal sexual gratification, an exceptional circumstance that could have taken the conduct outside the scope of their employment.
In sum, we conclude that Fred Meyer is vicariously liable, that reasonable minds could find the complained-of conduct outrageous, and that the uncontested findings satisfied the three elements of outrage. Consequently, we reverse the Court of Appeals and reinstate the trial court's judgment for Robel on her claim for intentional infliction of emotional distress. Robel's success on this claim makes unnecessary our consideration of Robel's companion claim for negligent infliction of emotional distress.
Defamation. A plaintiff bringing a defamation action must prove "four essential elements: falsity, an unprivileged communication, fault, and damages." Mark v. Seattle Times, 96 Wash.2d 473, 486, 635 P.2d 1081 (1981), cert. denied, 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982). Before the truth or falsity of an allegedly defamatory statement can be assessed, a plaintiff must prove that the words constituted a statement of fact, not an opinion. Because "expressions of opinion are protected under the First Amendment," they "are not actionable." Camer v. Seattle Post-Intelligencer, 45 Wash.App. 29, 39, 723 P.2d 1195 (1986) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 339, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (observing that "[u]nder the First Amendment *622 there is no such thing as a false idea")). Whether the allegedly defamatory words were intended as a statement of fact or an expression of opinion is a threshold question of law for the court. Id.
The trial court found that "[t]he defamatory communications by Fred Meyer's employees included that Robel was a `bitch,' a `cunt,' a `fucking bitch,' a `fucking cunt,' a `snitch,' a `squealer,' and/or a `liar,' and the comment that `only idiots demo.'" CP at 1337 (Finding of Fact 63). The Court of Appeals reasonably rejected as nonactionable opinions the vulgar names Robel's co-workers called her. Robel, 103 Wash.App. at 92, 10 P.3d 1104 (noting that "some statements ... cannot reasonably be understood to be meant literally and seriously and are obviously mere vituperation and abuse" (quoting RESTATEMENT (SECOND) OF TORTS § 566, cmt. e (1977))). The Court of Appeals concluded that the remaining words"snitch," "squealer," "liar," and "idiot"were arguably defamatory statements of fact but that Robel's claim failed because the trial court had made no finding of damages arising from the defamation claim.
We conclude, however, that none of the allegedly defamatory words could carry defamatory meaning in this case. The vulgarisms, along with the word "idiot," were plainly abusive words not intended to be taken literally as statements of fact. To determine whether the words "snitch," "squealer," and "liar" should likewise be viewed as nonactionable opinions, we consider the "totality of the circumstances" surrounding those statements: "To determine whether a statement is nonactionable, a court should consider at least (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." Dunlap v. Wayne, 105 Wash.2d 529, 539, 716 P.2d 842 (1986) (regarding as a nonactionable opinion, not a statement of fact, opposing counsel's statement to plaintiff's employer that plaintiff had been soliciting a kickback).
Applying the Dunlap court's three-factor test and its reasoning, we hold as a matter of law that, as with the vulgarisms and the word "idiot," the words "snitch," "squealer," and "liar" likewise constituted nonactionable opinions. Regarding the first factor, medium and context, at issue here were oral statements made in circumstances and places that invited exaggeration and personal opinion. Those engaging in the name-calling were Robel's co-workers and superiorsindividuals who were potentially interested in discrediting her complaints to management about questionable food handling practices in the deli or who were personally interested in ostracizing Robel in the workplace.
The second Dunlap factor, the audience, likewise suggests that the remarks are to be regarded as nonactionable opinions. According to the trial court's finding, "[t]he defamatory communications were published to Fred Meyer's customers and/or Robel's co-workers and/or Robel's management personnel."[10] As an audience, Robel's co-workers and managers were certainly "prepared for mischaracterization and exaggeration." Dunlap, 105 Wash.2d at 541, 716 P.2d 842. They would have been aware of the animosity between Robel and other co-workers. Such words as "snitch," "squealer," and "liar" would have registered, if at all, as expressions of personal opinion, not as statements of fact. Likewise, customers hearing the comments would reasonably perceive that the speaker was an antagonistic or resentful co-worker.
Analysis of the third factor, whether the words implied undisclosed defamatory facts, yields the same resultan unsurprising result since the context and audience often ensure that any implicit facts will be perceived as "merely a characterization of those facts." Ollman v. Evans, 750 F.2d 970, 985 (D.C.Cir.1984). To the extent the words *623 were published to deli workers, that audience would have known the facts ostensibly underlying the epithets "snitch," "squealer," and "liar"that Robel had been recording in her journal what she believed were questionable practices in the deli and that she had voiced her complaints to management. Likewise, the remark made to customersthat Robel was "`demoing' pizzas" because she had "lied about her back"implies no undisclosed defamatory facts; rather, the remark overtly explains why the resentful, unprofessional co-worker regarded Robel as a "liar." CP at 1333 (Finding of Fact 23).
Because we conclude that all of the utterances identified in the finding were nonactionable opinions, we affirm the reversal of the trial court's judgment on Robel's defamation claim.
Robel's Request for Attorney Fees on Appeal. In a supplemental brief filed with this court, Robel requested costs and a reasonable attorney fee. Because no fee request was made in her petition for review, the issue was not properly raised before this court. See RAP 13.7(b). We also note that Robel based the fee request made in the supplemental brief on RCW 51.52.130, a statute that she did not cite below as a basis for a fee award. While RAP 12.1(b) gives this court the latitude to consider an issue not properly raised, the rule pertains to issues that, in our view, "should be considered to properly decide a case." Because Robel's fee request is not such an issue, we deny the request.

CONCLUSION
On Robel's claims of disability discrimination, retaliation for filing a workers' compensation claim, and intentional infliction of emotional distress, we reverse the Court of Appeals and reinstate the trial court's judgment in Robel's favor. We affirm the reversal of the trial court's judgment for Robel on her defamation claim and deny Robel's request for attorney fees on appeal.
The Court of Appeals decision is affirmed in part and reversed in part.
ALEXANDER, C.J., JOHNSON, IRELAND and CHAMBERS, JJ., concur.
BRIDGE, J. (dissenting in part).
The incidence of harassment and discrimination in the workplace is terrifying and real. Its occurrence is remediable at law. The remedy, however, must be applied against those truly culpable for the injury caused. Our case law precedent is clear that an employer is not responsible for resolving issues between employees in conflictno matter how hurtful to the putative victim of the conflict. An employer becomes liable when he or she participates through an identifiable agent or takes no action in the face of repeated harassment which is attributable to a protected classification, and which is committed in the furtherance of the perpetrator's employment. If these conditions are not present, the culprit at law must be the offending employee, "deep-pocket" considerations aside. Empathy for those for whom going to work becomes a nightmare is insufficient to hold otherwise noncomplicit employers liable for the harm done by rogue employees. With these considerations in mind, I turn to the case at bar.
Linda Robel began work at Fred Meyer[1] in the deli department in December 1995. The following month, Robel and co-worker Tiffany Ware had a falling out over Ware's relationship with Robel's son. Unfortunately for Robel, Ware was a close friend of the deli's assistant manager, Amy Smith. The unhappy result of this situation was that the mutual animosity between Robel and Ware inevitably spilled over into the workplace, subjecting Robel to various verbal taunts and tricks by her co-workers. Robel was distressed by her co-workers' abusive behavior, but that behavior was clearly the result of a personality conflict, not action by or on behalf of her employers. Nor, as Robel claims, was the behavior caused by her back injury or her filing a workers' compensation claim in fact, much of the offensive behavior predated *624 both of these events. This clash, no matter how distasteful, is insufficient to support a claim for outrage or negligent infliction of emotional distress against Robel's employer. In fact, once the responsible agent of her employer became aware of the situation, action was taken. Ultimately, Robel's "harasser" was fired. Therefore, I respectfully dissent from the majority's holdings as to disability discrimination, retaliation, and outrage. I concur with the majority's holding that a defamation claim is not actionable on these facts.

STANDARD OF REVIEW
The majority asserts that because Fred Meyer has failed to challenge the trial court's findings of fact, we must accept them as verities on appeal. State v. Stenson, 132 Wash.2d 668, 697, 940 P.2d 1239 (1997). However, a conclusion of law is a conclusion of law wherever it appears, even if it is erroneously labeled a finding of fact. Kane v. Klos, 50 Wash.2d 778, 788, 314 P.2d 672 (1957); Local Union 1296, Int'l Ass'n of Firefighters v. City of Kennewick, 86 Wash.2d 156, 161-62, 542 P.2d 1252 (1975). Conclusions of law are reviewed de novo. State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996). Furthermore, mixed questions of law and fact are subject to review despite a party's failure to assign error to the finding. State v. Niedergang, 43 Wash.App. 656, 660-61, 719 P.2d 576 (1986).
We have stated that a "`"finding of fact is the assertion that a phenomenon has happened or is or will be happening independent of or anterior to any assertion as to its legal effect."'" Leschi v. Highway Comm'n, 84 Wash.2d 271, 283, 525 P.2d 774 (1974), 804 P.2d 1 (1974) (quoting NLRB v. Marcus Trucking Co., 286 F.2d 583, 590-91 (2d Cir. 1961) (quoting Louis L. Jaffee, Judicial Review: Question of Law, 69 HARV. L.REV. 239, 241 (1955))). See also State v. Williams, 96 Wash.2d 215, 221, 634 P.2d 868 (1981) ("Where findings necessarily imply one conclusion of law the question still remains whether the evidence justified that conclusion.") (citing Cline v. Altose, 158 Wash. 119, 126, 290 P. 809 (1930)). In contrast, a conclusion of law is a "determination [that] is made by a process of legal reasoning from facts in evidence." Niedergang, 43 Wash. App. at 658-59, 719 P.2d 576.
This court has had several opportunities to evaluate whether findings of fact were in actuality, conclusions of law. In Ridgeview Properties v. Starbuck, 96 Wash.2d 716, 719, 638 P.2d 1231 (1982), we held that a trial court's finding of fact that "[a] dual agency relationship was not established at any time during [the] transaction" was actually a conclusion of law. In Woodruff v. McClellan, 95 Wash.2d 394, 396, 622 P.2d 1268 (1980), we held that a trial court's finding of fact that defendants properly rescinded the earnest money agreement was actually a conclusion of law because the term "rescission" carried a legal implication. See also Cline, 158 Wash. at 126, 290 P. 809 (in landlord-tenant action, finding of fact that actions of parties adequately established respondent's right to a damage award was actually a conclusion of law because it necessarily implied that there was a constructive eviction); Niedergang, 43 Wash.App. at 660, 719 P.2d 576 (holding that trial court's finding of fact that defendant's automobile was parked outside curtilage of his house was at least mixed question of law and fact because "curtilage" could only be determined by examining facts of case); Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc., 21 Wash.App. 194, 197, 584 P.2d 968 (1978) (holding trial court's finding of fact that plaintiff had cured the breach was actually a conclusion of law).
Applying the above definitions, I agree with Fred Meyer that many of the trial court's findings of fact are truly conclusions of law and are as such subject to review. I will address the erroneously labeled findings as they are relevant.

DISABILITY DISCRIMINATION
Although I agree with the majority that Washington's antidiscrimination statute supports a disability based hostile work environment claim, I disagree that the findings of fact in this case support such a claim.
Adopting the framework established in Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 406-07, 693 P.2d 708 (1985), the *625 majority holds that a "plaintiff in a disability based hostile work environment case must prove (1) that he or she was disabled within the meaning of the antidiscrimination statute, (2) that the harassment was unwelcome, (3) that it was because of the disability, (4) that it affected the terms or conditions of employment, and (5) that it was imputable to the employer." Majority at 616.
The uncontested findings of fact do not support the majority's conclusion that Robel was harassed because of her disability. The trial court found that "[t]he verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996, was directly or proximately related to her disability and/or Fred Meyer's perception of Robel as disabled."[2] The majority, however, was unwilling to draw a distinction between "directly or proximately related to" and "because of" the disability. Majority at 617. Under current Washington law, this distinction must be made.
In Glasgow, this court indicated that to satisfy the "because of" prong, the prohibited classification must be the "motivating factor for the unlawful discrimination." 103 Wash.2d at 406, 693 P.2d 708 (emphasis added). In the context of disability harassment, the question the court must ask is whether "the employee would have been singled out and caused to suffer the harassment if the employee had" not been disabled? Id. In Robel's case, the answer is clearly yes.
Because the trial court's findings of fact were not challenged, we must accept its finding that the harassment after Robel's injury was "directly or proximately related to her disability."[3] However, this finding alone is insufficient to support the conclusion that the harassment was "because of" Robel's disability. The harassment suffered by Robel began long before she became disabled. As early as January 1996, Robel began to experience hostility from her co-workers. This hostility continued and worsened in the months that followed, and included a particularly nasty confrontation with Tiffany Ware. At that time, Robel was not disabled. After Robel suffered a lower back injury, requiring that she work only a light duty shift, only one incident referenced Robel's disability. These facts clearly indicate that Robel would have been harassed even if she had remained able-bodied. Given the ongoing pattern of harassment and its genesis in significant personality differences, had Robel not suffered her back injury, it is unfortunate but likely that the adverse treatment would have endured in another form.
In Doe v. Department of Transportation, 85 Wash.App. 143, 149, 931 P.2d 196 (1997), the Court of Appeals held that the plaintiff had failed to establish that his supervisor's comments, although sexual in nature, were motivated by the plaintiff's gender. The court found that the supervisor had instead singled out people "who appeared to be particularly offended by his conduct regardless of the victims' sex." Id.
In evaluating hostile work environment claims under the federal Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, several circuit courts have similarly held that isolated incidents of harassment were not motivated by plaintiffs' disabilities even though at least some of the harassing conduct may have been related to the plaintiffs' disabilities. See Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir.1998) (holding that plaintiff failed to establish that harassment was due to his disabilities even though three incidents were related to his disability); Cannice v. Norwest Bank Iowa N.A., 189 F.3d 723, 725-26 (8th Cir.1999) (holding that plaintiff failed to establish that alleged harassment was "because of" his disability even though two isolated incidents may have been connected to his mental condition; "[i]nsensitivity alone does not amount to harassment").
Where federal courts have upheld disability discrimination claims based on a hostile work environment, the harassment did not begin until after the employee suffered the disability or the employer became aware of it. See, e.g., Fox v. Gen. Motors Corp., 247 F.3d 169, 172-73 (4th Cir.2001) (plaintiff, who *626 had worked for defendant for many years, did not suffer harassment until after he received light work load due to his back injury); Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 236 (5th Cir.2001) (finding that plaintiff and her supervisor had been good friends prior to supervisor's discovery that plaintiff was HIV (human immunodeficiency virus) positive and that harassing treatment of plaintiff did not begin until thereafter). Plainly, such was not the case for Robel.
Therefore, I would hold that Robel failed to establish that she was harassed because of her disability, an essential element of her disability discrimination claim.[4]

OUTRAGE
The tort of outrage requires the plaintiff to show: (1) extreme or outrageous conduct by the defendant; (2) that the conduct was intentional or reckless; and (3) that the plaintiff actually suffered severe emotional distress as a result. Dicomes v. State, 113 Wash.2d 612, 630, 782 P.2d 1002 (1989) (citing Rice v. Janovich, 109 Wash.2d 48, 61, 742 P.2d 1230 (1987)). The conduct at issue must be "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. at 630, 782 P.2d 1002 (emphasis omitted) (quoting Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975)).
Although whether the defendant's conduct is sufficiently outrageous is a question of fact for the jury, before a claim of outrage can go to the jury, the court must first determine "if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." Id. at 630, 782 P.2d 1002. In deciding this threshold question, the majority reversed the Court of Appeals concluding that on these facts "reasonable persons could deem the employer's conduct ... sufficiently outrageous to trigger liability." Majority at 620. The majority applied this standard to the wrong set of facts, relying on the conduct of Robel's co-workers. However, Robel's action is against Fred Meyer, not her co-workers. Thus, the correct inquiry is whether Fred Meyer's conduct in responding to the co-workers' behavior was "sufficiently extreme [as] to result in liability?" I believe that it was not.
First, when the findings of fact are taken as a whole, Fred Meyer's direct action and/or inaction was not sufficient to result in liability. Although the trial court found that "Fred Meyer through its action and/or inaction allowed and/or fostered the verbal and non-verbal harassment in the work setting,"[5] it also found that when Robel chose to complain about the harassment or other problems in her department, Fred Meyer generally responded to her concerns. For example, when Robel first complained about the food handling problems in the deli to the store's director, Steve Wissink, Wissink undertook an investigation and found that the problems were insubstantial. Similarly, when Tiffany Ware was awarded a 40-hour position in the deli, the United Food and Commercial Workers Union successfully challenged the action on behalf of Robel. After her injury, Robel, through her union representative again reported incidents of harassment to Wissink, who then met with the deli employees and informed them that harassment would not be tolerated. When Wissink was informed that the harassment had continued, he conducted another investigation and eventually fired Ware.
*627 Fred Meyer's responses certainly were not "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Dicomes, 113 Wash.2d at 630, 782 P.2d 1002 (emphasis omitted) (quoting Grimsby, 85 Wash.2d at 59, 530 P.2d 291). Fred Meyer's actions were in no way as severe as those of Robel's co-workers, which the majority admitted was a "close call" in terms of creating the requisite level of outrageousness. Majority at 620.
It is not for this court to second guess what actions should have been taken. In examining the applicability of the tort of negligent infliction of emotional distress in the workplace, we have observed that "`employers, not the courts, are in the best position to determine whether such disputes should be resolved by employee counseling, discipline, transfers, terminations or no action at all.'" Snyder v. Med. Serv. Corp., 145 Wash.2d 233, 245, 35 P.3d 1158 (2001) (emphasis added) (quoting Bishop v. State, 77 Wash.App. 228, 234, 889 P.2d 959 (1995)). There seems to be no reason why the same latitude should not be given to employers in the context of the tort of outrage.
Second, in answering the threshold question of whether Fred Meyer's conduct was "sufficiently extreme" as to result in liability, Robel's co-workers' actions should not be imputed to Fred Meyer. Although the trial court found that "[t]he verbal and non-verbal harassment of Robel in the work setting is imputed to Fred Meyer and causally related to her emotional distress,"[6] this "finding of fact" is actually a conclusion of law and thus subject to review. Whether an action may be imputed to another party can be determined only by applying the relevant facts to the law. Cf. Niedergang, 43 Wash.App. at 658, 719 P.2d 576. Therefore, whether an act of an employee may be imputed to an employer is ultimately a question of whether the employer may be held vicariously liable for the acts of its employees acting outside the scope of their employment. We have already answered this question in the negative. Snyder, 145 Wash.2d at 242, 35 P.3d 1158. See also Niece v. Elmview Group Home, 79 Wash.App. 660, 664, 904 P.2d 784 (1995) ("When an employee's intentionally tortious or criminal acts are not in furtherance of the employer's business, the employer is not liable as a matter of law ...." (emphasis added)), aff'd, 131 Wash.2d 39, 929 P.2d 420 (1997).
In Niece, we held that "current Washington law clearly rejects vicarious liability for intentional or criminal conduct outside the scope of employment." 131 Wash.2d at 56, 929 P.2d 420. Again, in Snyder, we stated that "`[w]hen an employee's intentionally tortious or criminal acts are not in furtherance of the employer's business, the employer is not liable as a matter of law, even if the employment situation provided the opportunity or means for the employee's wrongful acts.'" 145 Wash.2d at 242, 35 P.3d 1158 (emphasis added) (quoting Niece, 79 Wash. App. at 664, 904 P.2d 784). See also McGrail v. Dep't of Labor & Indus., 190 Wash. 272, 277, 67 P.2d 851 (1937) (under traditional agency principles, principal may be liable for acts of its agents only if agent was "engaged in the performance of the duties required of him by his contract of employment or by the specific direction of his employer, or, as sometimes stated, whether he was engaged at the time in the furtherance of the employer's interests") (emphasis added).
In Snyder, the plaintiff claimed outrage based solely on the acts of her immediate supervisor, Hall. 145 Wash.2d at 242, 35 P.3d 1158. Hall's behavior toward the plaintiff and other employees was described as "authoritarian," "belligerent," and "harassing-type supervisor" and was severe enough as to cause some employees to quit. Id. at 236-37, 35 P.3d 1158. Hall specifically threatened Snyder[7] and, on one occasion, "poked" Snyder in the chest. Id. at 237, 35 P.3d 1158. Snyder and Hall's employer, Medical *628 Service Corporation (MSC), did nothing to stop Hall's offensive behavior even though MSC was aware of it. Id. at 236-37, 35 P.3d 1158. Because MSC had a policy forbidding "its supervisors to use physical force or threats of physical force," we concluded that Hall's actions were outside the scope of her employment, and thus, MSC could not be vicariously liable for Hall's actions. Id. at 243, 35 P.3d 1158.
Here, the actions by Robel's co-workers[8] were clearly outside the scope of their employment. Like the employer in Snyder, Fred Meyer had a policy forbidding "harassment, threats, and intimidation involving one employee versus another."[9] Furthermore, it did not direct its employees to harass Robel.[10] Although these comments and actions may have been offensive to Robel, they were not "in furtherance of" Fred Meyer's business. In fact, unlike the actions by Hall in Snyder which tended to involve "work-related topicspay and unpaid overtime work," Snyder v. Medical Services Corp., 98 Wash. App. 315, 324, 988 P.2d 1023 (1999), the actions and comments by Robel's co-workers were largely unrelated to the workplace.
Despite the majority's assertion, merely because an employee is "on duty" does not mean that the employee was acting within the scope of his or her employment. See majority at 621. Washington courts have generally required more than the fact that an employee was "on duty" in order to hold his or her employer vicariously liable for the employee's intentionally tortious acts. "When an employee's intentionally tortious or criminal acts are not in furtherance of the employer's business, the employer is not liable as a matter of law, even if the employment situation provided the opportunity or means for the employee's wrongful acts." Niece, 79 Wash.App. at 664, 904 P.2d 784 (emphasis added). See also 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: Tort Law and Practice § 3.7, at 89 (2d ed.2000) ("intentional torts of servants are not, generally as a matter of law, considered within the scope of employment or in furtherance of a master's business"); Hein v. Chrysler Corp., 45 Wash.2d 586, 600, 277 P.2d 708 (1954) ("An employee who willfully and for his own purposes violates the property rights of another ... is not acting in the furtherance of his employer's business.").
Numerous Washington cases have refused to impose liability on an employer for the intentional torts committed by their employees even though the employee was "on duty" at the time of the tort. See, e.g., Hein, 45 Wash.2d at 598-600, 277 P.2d 708 (holding employer not vicariously liable for employees malicious inducement of a breach of contract even though employees used employer's business to induce breach because employees not acting within scope of employment); Niece, 79 Wash.App. at 664, 904 P.2d 784 (group home employee not acting within scope of employment when he sexually assaulted a patient); Kuehn v. White, 24 Wash.App. 274, 277-79, 600 P.2d 679 (1979) (employer not liable for employee truck driver who assaulted another motorist in a roadside argument even though truck driver's employment technically created the opportunity for the conflict). *629 Under the majority's reasoning, an employer would essentially be strictly liable for all intentionally tortious actions committed by an employee who was "on duty" regardless of whether the actions were in furtherance of the employer's business. This position is clearly not supported by Washington law. See Niece, 131 Wash.2d at 54-56, 929 P.2d 420 (rejecting nondelegable theory of employer liability for intentional acts of its employers acting outside the scope of their employment).
Because we have declined to hold employers vicariously liable as a matter of law in exactly this type of situation, Robel's co-workers' actions cannot be imputed to Fred Meyer. The circumstances here are virtually indistinguishable from our recent decision in Snyder except insofar as the employee's actions in that case were arguably more egregious and the employer's actions less responsive. Yet, there was no liability for the employer in Snyder. The actions of Robel's co-workers may not be used to determine that reasonable minds could differ as to whether Fred Meyer's actions were sufficiently extreme as to warrant liability.

RETALIATION
Without justification, the majority extends the tort of wrongful discharge recognized in Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 685 P.2d 1081 (1984) to encompass an act by an employer short of actual or constructive discharge. The majority merely substitutes the word "discrimination" for "discharge." However, the majority fails to define any limitation to the tort or to provide any justification expanding the tort beyond acts of discharge. I would continue to limit successful wrongful discharge claims to those that can show actual or constructive discharge.
In Thompson, we emphasized that the wrongful discharge exception to the employment at will doctrine was narrow and required balancing the interest of the employer to be protected against frivolous lawsuits with the interest of the employee to be protected against employer actions that contravene a clear public policy. Id. at 223, 232-33, 685 P.2d 1081. Wrongful discharge claims have generally been allowed in four circumstances: "`(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.'" Warnek v. ABB Combustion Eng'g Servs., Inc., 137 Wash.2d 450, 461, 972 P.2d 453 (1999) (emphasis added) (quoting Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 936, 913 P.2d 377 (1996)).
Although RCW 51.48.025(1) states that "[no] employer may discharge or in any manner discriminate against an employee because such employee has filed or communicated to the employer any intent to file a claim for compensation or exercises any rights provided under this title," the statute does not provide a direct cause of action for an aggrieved employee.[11] It does, however, provide the requisite public policy used by this court to establish an action for wrongful discharge in Wilmot v. Kaiser Aluminum & Chemical Corp., 118 Wash.2d 46, 821 P.2d 18 (1991). In Wilmot, we held that a plaintiff could make out a prima facie case for retaliatory discharge by showing "(1) that he or she exercised the statutory right to pursue workers' benefits under RCW Title 51 or communicated to the employer an intent to do so or exercised any other right under RCW Title 51; (2) that he or she was discharged; and (3) that there is a causal connection between the exercise of the legal right and the discharge." Id. at 68, 821 P.2d 18. In determining whether our common law tort of wrongful discharge is broad enough to cover *630 adverse employer actions less than actual discharge, we must look at the purpose of the public policy issue, as well as the tort itself.
In White v. State, 131 Wash.2d 1, 18, 929 P.2d 396 (1997), we addressed for the first time whether an adverse employer action less than actual discharge is actionable where the action violates a clear mandate of public policy. There, we were asked to adopt a cause of action for wrongful transfer in violation of public policy where the transfer did not result in a loss of pay, rank, job classification, or benefits. Id. at 7, 18, 929 P.2d 396. In declining to adopt such an action, we stated that recognizing a cause of action for employer actions short of actual discharge would open "a floodgate to frivolous litigation and substantially interfer[e] with an employer's discretion to make personnel decisions." Id. at 19, 929 P.2d 396 (citing White v. State, 78 Wash.App. 824, 839-40, 898 P.2d 331 (1995)).
In Warnek, we addressed the related issue of whether wrongful discharge encompassed an action for wrongful refusal to rehire. 137 Wash.2d at 461-62, 972 P.2d 453. The plaintiffs in Warnek alleged that the defendant had refused to rehire them after they had been laid off because they had filed workers' compensation claims in another state. Id. at 453, 972 P.2d 453. We held that prior Washington case law did not provide a cause of action for a former employee who had previously filed a workers' compensation grievance. Id. at 458, 972 P.2d 453. We emphasized that the plaintiffs had failed to establish the requisite element that they be "fired" or "discharged." Id. at 461, 972 P.2d 453.
Other jurisdictions have been similarly reluctant to expand the tort of wrongful discharge to include lesser disciplinary actions. See Ludwig v. C & A Wallcoverings, Inc., 960 F.2d 40, 42-43 (7th Cir.1992) (rejecting tort of retaliatory demotion); Sanchez v. Philip Morris Inc., 992 F.2d 244, 249 (10th Cir.1993) (refusing to adopt tort of wrongful failure to hire); LaFriniere v. Group W Cable, Inc., 670 F.Supp. 897, 898 (1987) (finding no cause of action for wrongful demotion under Montana law); Zimmerman v. Buchheit of Sparta, Inc., 164 Ill.2d 29, 206 Ill.Dec. 625, 645 N.E.2d 877 (1994) (refusing to extend tort of wrongful discharge to include demotions or discrimination for employee pursuing workers' compensation claim); Mintz v. Bell Atl. Sys. Leasing Int'l, Inc., 183 Ariz. 550, 553, 905 P.2d 559 (1995) (rejecting tort of wrongful failure to promote in violation of public policy); Burris v. City of Phoenix, 179 Ariz. 35, 43, 875 P.2d 1340 (1993) (rejecting new tort of wrongful failure to hire); Williams v. Dub Ross Co., 895 P.2d 1344, 1347 (Okla.Ct.App.1995) (refusing to expand public policy doctrine to include wrongful failure to hire).[12] In the few jurisdictions to extend the wrongful discharge action, the plaintiffs all suffered actual adverse employment actions. See Brigham v. Dillon Cos., 262 Kan. 12, 20, 935 P.2d 1054, 1059-60 (1997) (recognizing cause of action for retaliatory demotion); Powers v. Springfield City Sch., No. 98-CA-10, slip op., 1998 WL 336782, at *5-6 (Ohio Ct.App., June 26, 1998) (recognizing cause of action for wrongful denial of promotion).[13]
In Zimmerman, the Illinois Supreme Court addressed the identical question presented in this case: whether the statutory prohibition on employers discriminating against an employee who files a workers' compensation claim gives rise to a common law cause of action. 164 Ill.2d at 31, 206 Ill.Dec. 625, 645 N.E.2d 877. Although the Illinois court had recognized a wrongful discharge action in such situations, it refused to adopt a cause of action for lesser disciplinary actions, holding that to do so would "replace the well-developed element of discharge with a new, ill-defined, and potentially all-encompassing *631 concept of retaliatory conduct or discrimination." Id. at 39, 206 Ill.Dec. 625, 645 N.E.2d 877.
The basic premise behind the wrongful discharge claim as related to the workers' compensation statute is to ensure that employees are able to utilize the benefits offered by that statute. When an employee successfully files for workers' compensation and retains his or her position, this purpose is effectuated. However, when an employee is wrongfully discharged for filing or expressing an intent to file a workers' compensation claim, the purpose is frustrated. Without the claim for retaliatory discharge, the employee would be placed in the position of choosing between his or her job and seeking the remedies afforded under the workers' compensation statute. See Zimmerman, 164 Ill.2d at 33, 206 Ill.Dec. 625, 645 N.E.2d 877. The same choice would not arise to an employee who faces a lesser disciplinary action. Extending the wrongful discharge cause of action to lesser disciplinary actions would allow an employee to obtain greater rights than the workers' compensation statute otherwise allows. This would upset both the balance struck by the workers' compensation statute and by the tort of wrongful discharge generally.
But even if I agreed that wrongful discharge should be extended to lesser employer actions, I cannot agree that the conduct here meets the majority's test. Robel has simply not met her burden to prove that Fred Meyer discriminated against her in some way or that the discrimination was causally connected to her workers' compensation claim. See majority at 619.
The findings of fact do not support the conclusion that Fred Meyer "discriminated" against Robel[14] because she filed a workers' compensation claim.[15] After suffering a back injury at work, Robel successfully filed for workers' compensation. There is no indication that Fred Meyer attempted to prevent her from filing this claim or that she was in any way denied benefits. The record also clearly shows that Fred Meyer accommodated her injury by giving her a light duty shift. In fact, only the "slip and fall" incident is even related to Robel's filing of a workers' compensation claim.[16]
Finally, to satisfy the third prong of the Wilmot test adopted by the majority, Robel must show that the discharge was motivated by the plaintiff's protected activity. Wilmot, 118 Wash.2d at 68, 821 P.2d 18. Although tracking the language of the Wilmot test, the trial court's finding that there was "a direct causal connection between Robel's protected activity and the adverse employment action,"[17] does not clearly establish that the workers' compensation claim motivated the adverse actions of Robel's co-workers. Taken as a whole, the record shows a pattern of negative treatment by Robel's co-workers that began nearly six months before she filed her claim and involved many statements completely unrelated to her claim.[18] Therefore, I disagree with the majority that Robel satisfied her burden to prove the second two elements of her retaliation claim.

CONCLUSION
Although Robel was treated horribly by her fellow Fred Meyer employees, the adverse treatment was attributable to personality conflicts among these employees and not *632 to management action or inaction. Thus, I do not believe that such treatment gives rise to any sustainable claim against her employer under Washington law. I therefore respectfully dissent from the majority's opinion to the contrary.
SANDERS, SMITH and MADSEN, JJ., concur.
NOTES
[1] Finding of Fact 28 (CP at 1333) does not indicate the date on which Robel contacted Banka, nor does Robel's journal mention the contact.
[2] The Court of Appeals cited seven cases wherein federal district courts held that the ADA encompassed hostile work environment claims. Robel, 103 Wash.App. at 86, 10 P.3d 1104. Six of those cases are among the twenty-one collected in Brian L. Porto, Annotation, Actions Under Americans with Disabilities Act (42 U.S.C.A. §§ 12101 et seq.), to Remedy Alleged Harassment or Hostile Work Environment, 162 A.L.R. FED. 603, 612-24, 2000 WL 713732 (2000). Of the twenty-one cases Porto summarizes, he categorizes only three as denying recognition of hostile work environment disability claims. See also Fox v. Gen. Motors Corp., 247 F.3d 169 (4th Cir.2001); Flowers v. S. Reg'l Physician Servs., Inc., 247 F.3d 229 (5th Cir.2001) (claims for hostile work environment cognizable under the ADA).
[3] See supra note 2.
[4] Apparently misconstruing the relevant findings of fact as conclusions of law, the Court of Appeals embarked on its own analysis of this fourth factor and concluded that the findings of fact did not establish that the disability based harassment was sufficiently pervasive, severe, and persistent to affect the terms and conditions of Robel's employment. Robel, 103 Wash.App. at 86-87, 10 P.3d 1104.
[5] In re Marriage of Booth, 114 Wash.2d 772, 777, 791 P.2d 519 (1990) (in absence of written finding, appellate court may look to oral opinion). Managers are those who have been given by the employer the authority and power to affect the hours, wages, and working conditions of the employer's workers. The trial court referred to Smith as "a management representative of Fred Meyer" and likewise referred to deli manager Evelyn Potts as "management employee Potts." Report of Proceedings (RP) at 550, 551, 553. Smith, as "assistant deli manager," made the work assignments in the deli and joined Potts in interviewing Robel for transition into a 40-hour position. CP at 1330 (Finding of Fact 6); RP at 179; Joint Ex. 201, at 20. Fred Meyer failed to assign error to the trial court's findings that management-level employees participated in the harassment.
[6] The unchallenged findings of fact refer to "[t]he verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996," as well as "Fred Meyer's actions and/or inactions in regard to [such] harassment." CP at 1334-35 (Findings of Fact 35-36). Although we are not called upon to weigh the sufficiency of the evidence supporting these unchallenged findings, we do note that the record shows incidents spanning the period August 1, 1996, through September 13, 1996. See supra at pages 2-4.
[7] Reid v. Pierce County, 136 Wash.2d 195, 202, 961 P.2d 333 (1998) (citing Dicomes, 113 Wash.2d at 630, 782 P.2d 1002; RESTATEMENT (SECOND) OF TORTS § 46 (1965)). Robel's complaint alleges intentional infliction of emotional distress; outrage encompasses causes of action based on reckless and intentional conduct.
[8] In Niece, this court took pains to say that there may be other bases of employer liability for the criminal conduct of employees quite apart from vicarious liability:

Even where an employee is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others. This duty gives rise to causes of action for negligent hiring, retention and supervision. Liability under these theories is analytically distinct and separate from vicarious liability. These causes of action are based on the theory that "such negligence on the part of the employer is a wrong to [the injured party], entirely independent of the liability of the employer under the doctrine of respondeat superior." Scott v. Blanchet High Sch., 50 Wash.App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am.Jur.2d Master and Servant § 422 (1970)), review denied, 110 Wash.2d 1016 (1988).
Niece, 131 Wash.2d at 48, 929 P.2d 420 (alteration in original).
[9] Indeed, prior to Snyder, Washington case law regarding intentional torts and vicarious liability was mostly confined to sexual misconduct; naturally, the courts have held that the sexual acts of employees are not within the scope of employment. See C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wash.2d 699, 985 P.2d 262 (1999) (holding that diocese could not be held vicariously liable for sexual abuse by priests); Niece, 131 Wash.2d 39, 929 P.2d 420 (holding that group home was not vicariously liable for the rape of a disabled resident by an employee); Blenheim v. Dawson & Hall, Ltd., 35 Wash.App. 435, 667 P.2d 125 (1983) (holding that employer could not be held vicariously liable where employees acted for their own purposes by assaulting and raping a dancer at a company Christmas party).
[10] CP at 1338 (Finding of Fact 64). The use of "and/or" in this finding, taken literally, would mean that the audience could have been any one of the three or all threecustomers, co-workers, managers. Because a previous finding provides that unnamed deli workers "told customers [Robel] had lied about her back and was being punished by Fred Meyer by `demoing' pizzas," we can conclude that the audience included unidentified "customers." CP at 1333 (Finding of Fact 23).
[1] Roundup Corp. does business as Fred Meyer, Inc. For consistency, I will use the name "Fred Meyer" when referring to Roundup Corp.
[2] Clerk's Papers (CP) at 1334 (Finding of Fact 31).
[3] CP at 1334 (Finding of Fact 31).
[4] Because I find that the harassment suffered by Robel was not motivated by her disability, I see no need to address whether the harassment was properly imputed to Fred Meyer under the Glasgow framework. However, I believe the majority's attempt to qualify Potts as a "manager" as the term is used in Glasgow is inappropriate. This court has never defined the term "manager" for the purpose of hostile work environment actions and I do not believe it is proper to make such broad assertions as to whom is covered by the term in this case, especially given the trial court's failure to make a specific finding on the issue. See 6A WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 330.23, at 243 cmt. (1997) ("There is no Washington case which examines the term `manager' for purposes of imputing liability to the employing entity."); Henningsen v. Worldcom, Inc., 102 Wash.App. 828, 837-38, 9 P.3d 948 (2000).
[5] CP at 1336 (Finding of Fact 47).
[6] CP 1332 (Finding of Fact 19).
[7] After giving Snyder a raise, Hall told her that if she told anyone where she got the raise from, Hall would "literally hunt Ms. Snyder down and `kill her.'" Snyder, 145 Wash.2d at 237, 35 P.3d 1158. In addition, when Snyder told Hall that she would not work an unpaid Saturday, Hall accused Snyder of insubordination. Id.
[8] Although the majority repeatedly emphasizes the titles of employees Potts and Smith ("deli manager" and "assistant deli manager" respectively), the law of agency does not differentiate between various levels of employees. See 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: Tort Law and Practice §§ 3.2, 3.3, at 82-84 (quoting RESTATEMENT (SECOND) OF AGENCY § 220 (1958) ("`[a] servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.'")). Therefore, the fact that Smith participated in the abusive behavior or that Potts was aware of it is irrelevant as to whether liability should be imposed on Fred Meyer.
[9] CP at 1336 (Finding of Fact 50).
[10] The trial court found that "Fred Meyer, through the acts of its managers, participated, authorized, knew and/or should have known of the verbal and non-verbal harassment of Robel in the work setting subsequent to July 14, 1996." CP at 1335 (Finding of Fact 38). However, this finding, when compared with other findings of the trial court, is insufficient to establish that Fred Meyer "directed" its employees to treat Robel badly. See, e.g., CP at 1334 (Finding of Fact 30) ("Subsequent to ... July 14, 1996, Robel was subjected to verbal and non-verbal harassment in the work setting by co-employees and Fred Meyer's management personnel, notwithstanding a directive to cease.").
[11] Under RCW 51.48.025(2), "[a]ny employee who believes that he or she has been discharged or otherwise discriminated against by an employer in violation of this section may file a complaint with the director alleging discrimination within ninety days of the date of the alleged violation .... (3)[i]f the director determines that this section has not been violated, the employee may institute the action on his or her own behalf." There is no indication that Robel filed such a claim with the director in this case.
[12] See also Michael D. Moberly & Carolann E. Doran, The Nose of the Camel: Extending the Public Policy Exception Beyond the Wrongful Discharge Context, 13 LAB. LAW. 371, 372 (1997) (finding that although public policy exception to employment at will doctrine has been recognized in 39 states, "it rarely has been applied in cases involving employer actions other than discharge").
[13] Although California has recognized a cause of action for wrongful demotion, it did so by finding that the plaintiff had an implied contractual agreement with the employer not to demote without good cause. Scott v. Pac. Gas & Elec. Co., 11 Cal.4th 454, 466, 46 Cal.Rptr.2d 427, 904 P.2d 834 (1995).
[14] As noted above, the majority does not define the term "discrimination" as used in this context. I would interpret this term to require an actual adverse employment action, such as a demotion or adverse transfer, or a hostile work environment that amounts to an adverse employment action.
[15] Because the words "retaliation" and "unlawful" in findings of fact 35 and 36 carry a legal implication, they are more accurately characterized as a legal conclusion. See cf. Woodruff, 95 Wash.2d at 396, 622 P.2d 1268. Thus, these conclusions are subject to review.
[16] CP at 1333 (Finding of Fact 23) ("On or about August 1, 1996, Robel was at the display table, and Ware and another deli worker laughed, acted out a slip and fall. Robel testified one of them yelled "`Oh, I hurt my back, L & I, L & I.'").
[17] CP at 1335 (Finding of Fact 37).
[18] See, e.g., CP at 1330-33, 1337-38 (Findings of Fact 7, 12, 15, 25, 63, 65).